James O'Keefe, Plaintiff-Appellee, v. Lithocolor Press, Inc., a Corporation, and Robert Gunderson, Defendants-Appellants.

Gen. No. 49,211.

First District, Fourth Division.

May 6, 1964.

Gates W. Clancy, of Geneva (Wendell W. Clancy, of counsel), for appellants.

John A. Doyle and James S. Montana, of Chicago, for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken from a judgment for $15,000 in favor of James O'Keefe, plaintiff, against Lithocolor Press, Inc., a corporation, and Robert Gunderson. The case was tried before a jury and the judgment was entered on the jury's verdict. The defendants filed a post-trial motion which the trial court denied. The defendants' theory in this court is that the court erred in not allowing them a new trial because the verdict was excessive and was based on irrelevant, prejudicial and speculative evidence and was contrary to the manifest weight of the evidence.

The case grew out of an accident which occurred on October 3, 1958, when the plaintiff, aged 25, was driving a station wagon on First Avenue at or near its intersection with Chicago Street in the Village of Maywood, Illinois. At the time of the accident both the plaintiff and Gunderson were traveling in a northerly direction on First Avenue. The plaintiff was driving a vehicle owned by his employer and had just completed making a delivery. Gunderson was driving a vehicle owned by his employer, the defendant, Lithocolor Press, Inc., and was in the process of making a delivery.

Both First Avenue and Chicago Street are 4-lane highways at the point of intersection. Chicago Street runs east and west; First Avenue runs north and south. The intersection is controlled by traffic signals. On the date of the occurrence the street was dry and the sky clear, and there were no obstructions. As the two drivers proceeded north on First Avenue the plaintiff was in front of Gunderson. Gunderson was traveling at approximately 30 miles per hour. In front of both of the drivers was a black Ford automobile being driven by an unidentified woman. All three vehicles were traveling in the lane of traffic closest to the curb. Approximately 100 to 150 feet before the intersection the unidentified woman driver in the lead car turned on her right directional signal which was seen by the plaintiff. The plaintiff, who was approaching the intersection at approximately 25 miles per hour and one and one-half car lengths behind the woman, slowed down to allow her to make a turn. The traffic signal at the time was green for traffic proceeding in a northerly direction. O'Keefe brought his car to a stop 2 feet south of the traffic light which was about 8 feet south of the corner. The vehicle operated by Gunderson struck the rear of the vehicle operated by the plaintiff. The front of Gunderson's car was severely damaged, as was the car of the plaintiff.

Immediately after the accident the plaintiff talked to Gunderson and the plaintiff testified that Gunderson had told him he had seen the plaintiff applying his brakes; that he had seen the woman in front of him with her direction light indicating a right turn; [*] and when the plaintiff asked Gunderson why he hit him, he answered that he could not stop in time.

[*] This statement is contradicted by Gunderson.

126

A Maywood police officer testified that he came to the scene of the accident and had talked to the plaintiff and Gunderson, and that there were approximately 30 feet of skid marks leading up to the rear tires of Gunderson's vehicle. The plaintiff told the police officer that he had stopped to allow the car ahead of him to make a turn, and Gunderson stated that he could not stop in time to avoid the accident.

In this court the defendants make no argument with reference to the issue of liability, and from that fact and from the record, we must assume that the jury on that issue properly found in favor of the plaintiff and against the defendants. The defendants ask that the verdict of the jury on the question of damages be reversed on the ground (1) that it is against the manifest weight of the evidence; (2) that it is excessive; and (3) that the medical evidence was speculative.

 The trial court may properly set aside a verdict because it is against the weight of the evidence. A reviewing court has the right to reverse a judgment entered in the trial court on the ground that the judgment is against the manifest weight of the evidence. A reviewing court, in passing on the question, must take into consideration not only the verdict of the jury but the fact that the trial judge saw and heard the witnesses, entered judgment and overruled the motion for a new trial. The question of the preponderance does not arise at all in a reviewing court. Read v. Cummings, 324 Ill App 607, 59 NE2d 325, cited and quoted in Vasic v. Chicago Transit Authority, 33 Ill App2d 11, 180 NE2d 347. In that case the court also quotes Devine v. Delano, 272 Ill 166, 180, 111 NE 742, 748, where it states:

> "A greater or less probability, leading, on the whole, to a satisfactory conclusion, is all that can reasonably be required to establish controverted

facts. (1 Greenleaf on Evidence,–16th ed–sec 1; Commonwealth v. Webster, 5 Cush 295; 11 Am & Eng Ency of Law,–2d ed–490.)"

The plaintiff in the instant case was 25 years old and, prior to the accident, in excellent health. He was accustomed to fish, hunt and bowl for recreation, and also did all the decorating, painting, washing of walls, around his house. He testified that when the automobile in which he was riding was struck he passed out; that when he regained consciousness he was slumped over the steering wheel; that he lifted his head and arms very slowly; that his legs felt as though they had been driven through the floorboard, and that he was dizzy and shaken up.

Gunderson testified that after the accident the plaintiff told him he was not hurt but that at the time the plaintiff was "normal but with shock."

After the accident the plaintiff returned to his employer's plant and worked the remainder of the day. Over the weekend his back and neck began to hurt, and the company arranged for him to go to the Callahan Clinic where he received heat treatments and massage for two months. A salve was prescribed for him. During the past four and one-half years since the accident he lost six or seven days of work. At the time of the trial he was not having any trouble with his neck.

After his attendance at the clinic, on the recommendation of his attorney, he went to see Dr. Woodhouse who examined him, prescribed certain exercises for him, and told him that when his back hurt to apply heat to it and not to do any heavy lifting, and to take it easy. The doctor stated that the only other thing that could be done would be an operation.

During all the period of time since the accident, the plaintiff has noticed that the small of his back hurts quite a bit, and he gets a numbing and tingling

sensation in the left leg which comes up the left side of the back quite often. He states that sometimes when he gets up in the morning he cannot bend over. He is now unable to hunt, fish or bowl, and he cannot do the work around the house which he formerly did. He has the same job he had on the date of the accident, but he does not do as much lifting, and has an extra man working with him. The plaintiff further testified that today his pay is $6 to $8 per day greater than it was on the date of the accident.

At the Callahan Clinic his head, neck and the lumbar region of his back were X-rayed. In all, three physicians testified. Dr. James Seagraves, who was associated with the Callahan Clinic, testified that he had seen the plaintiff 18 times at the Clinic and the chief treatment given him was physiotherapy consisting of heat and massage to his back; that when the plaintiff first came to the Clinic on October 7, 1958, he complained of a pain and weakness in his back and said the cause of the same was an accident which had occurred on October 3, 1958. X-rays were taken which were negative. He was again examined on October 23, and at that time he stated he was much improved although he still felt some pain. Dr. Seagraves testified that at that time it was his impression that the plaintiff had suffered soft tissue injury to the muscles and ligaments of the back; that he had no evidence of bony injury, and that it was his opinion at that time that the plaintiff would be all right.

Dr. Seagraves further testified that on December 10, 1958, the plaintiff returned to be examined, and at that time he had a slight scoliosis which can be caused by a soft tissue injury which in turn causes muscle spasticity. At that time he recommended that the plaintiff place a lift in his left shoe. The doctor further testified that the medical condition known as a herniated or slipped intervertebral disc is sometimes

manifested by pain in the lower back and pain going down the back side of either one of the extremities or both. The doctor said he did not find a slipped disc. He testified that the only way you can definitely make a diagnosis of an intervertebral disc is the result of myelograms.

Afterwards, in December of 1959, the plaintiff's back was hurting him. He then went to see Dr. Charles Woodhouse. Dr. Woodhouse testified that he was certified by the American Board of Orthopedic Surgeons in 1947, and that orthopedics is a surgery specialty dealing with joints, bones and muscles. He made an examination of the plaintiff on December 19, 1959, at which time he found that the plaintiff had a limitation of motion of his back, in the lower lumbar region, and that five vertebrae in the lower spine were more immobile than any of the other upper lumbar vertebrae. He found that the plaintiff had involuntary muscle spasm in the lower back at the same level where there was limitation of motion. He found on examination that the leg lengths were equal, but that measurements of his thighs were 16⅝ inches on the right and 16⅝ inches on the left. The calf measurements were 13 inches on the right and 13⅝ inches on the left, and that ⅝ inch is a significant measurement change. He performed a neurological examination and found a depression of the right ankle reflex and a bilateral limitation of straight leg raising of 20 degrees. At that time he had X-rays taken of the plaintiff which showed a scoliosis. At the time of the examination the plaintiff complained of a pain in his back and left leg. The doctor made a diagnosis that the plaintiff had a herniated intervertebral disc with neurological changes in the right leg. The X-rays were exhibited to the jury and testimony with regard to them was given by the witness. The doctor also testified that the only way to determine positively whether there

130

was such a disc condition would be to perform a myelogram. He further testified that he prescribed that the plaintiff take back exercises and use heat on his back, and if the plaintiff suffered great pain he should come in for a myelogram.

The doctor was then asked if he had an opinion, based upon a reasonable degree of medical and scientific certainty, as to whether or not the condition which he diagnosed with respect to the plaintiff was temporary, permanent or otherwise. He testified that in his opinion the condition was permanent, and he explained the reason why he so considered it.

The doctor was then asked a hypothetical question by counsel for the plaintiff, and counsel for the defendants objected to the question because it failed to include certain items of evidence which he indicated. Counsel for the plaintiff re-formed the question by asking the doctor whether, if all of the material recited by counsel for defendants was included in the question, he would "have an opinion as to whether or not the condition of ill being described in the hypothetical question might or could be causally related to the incident of trauma or injury of October 3, 1958." Counsel for the defendants objected and stated that the ground of his objection was "that this invades the province of the jury as the ultimate conclusion for which this suit is brought and the jury is to act." The court overruled the objection, and the doctor testified that in his opinion there was such a connection.

Dr. Carlo Scuderi was called as a witness for the defendants and stated that he was an orthopedic surgeon. He also stated in detail his education and various learned societies to which he belonged. He testified that on April 27, 1950, he had examined the plaintiff and that at the time the man had a complaint of severe headaches and discomfort of the neck. In the examination of plaintiff's lower back he found

131

that he had a slight left lumbar scoliosis [which means a lateral curvature]; that scoliosis can be caused by a number of things such as differences in the heights of the vertebrae; that he found on the day of examination no evidence of any sciatic nerve irritation and no evidence of persistent findings of a ligament damage. His leg lengths were the same and there was some difference in the circumference of the legs—". . . a little shrinkage . . . in the right thigh, . . ." and the same was in the right calf; that ". . . the difference of $7/8$ of an inch in the thigh does have some significance . . ." and that he could not tell what was the cause of this shrinkage.

He testified concerning the X-ray films taken of the plaintiff, and that he found only a slight scoliosis on one film; that he made a diagnosis which was that the plaintiff had soft tissue injury of the neck and lower back from which he had made a good recovery at this time. The time when he saw him was about 18 months after the injury occurred. On cross-examination he stated that it was his opinion "that diminution of size of Mr. O'Keefe's right thigh was due to atrophy. Disc pathology can be a cause of such atrophy." The doctor further testified that some of the complaints made to him by the plaintiff could be associated with disc pathology but it was his opinion that the plaintiff did not have any "herniated disc with nerve root pressure."

Mrs. O'Keefe had previously testified on behalf of her husband that on the day of the accident when he came home his face was white, he couldn't eat supper, and he stayed in bed over the first weekend; she further testified that sometimes she has to help him on with his shoes and socks, and that he seems at times unable to sit up. The plaintiff also testified that ever since the accident the small of his back hurts quite a bit; that he has at times a numbing and tingling sensation in the left leg which comes up the left

132

side of the back; that this is something that happens every other day; that sometimes this goes for two or three days, but when he walks around too much or sits too much his leg and back start hurting. This happens if it is raining and the dampness in the air irritates it. The headaches he has now are different from those which he had before the accident in that they are more severe and more often. He has headaches now every other day. Some of them last for two or three days and others last a few hours. When asked to describe what he noticed on an average day about what is wrong with his back he said, "Well, sometimes I get up in the morning, it hurts a little bit, and then along about mid-afternoon, it will start hurting more, and it hurts more in the afternoon than it does in the morning. There are times when I wake up in the morning, I can't bend over. I can't get out of bed."

■ The defendants in this court urge that the trial court erred in failing to sustain their objection to the hypothetical question propounded to Dr. Woodhouse. It is a well-recognized rule that a general objection to a question asked of a witness is not sufficient, where the defect is one that could be fully obviated in case a specific objection were made. (Chicago & E. I. R. Co. v. Wallace, 202 Ill 129, 66 NE 1096. Also see Stone v. Great Western Oil Co., 41 Ill 85.)

In Chicago City Ry. Co. v. Bundy, 210 Ill 39, at 46, 71 NE 28 at 30, the court states:

"Objection is also made to some of the hypothetical questions put to physicians who testified on behalf of appellee. These objections, made in the trial court, were not sufficiently specific to sustain the special objection here sought to be raised. In other words, the attempt is to raise a specific objection for the first time in this court. Counsel have a right to assume, within the lim-

its of the testimony, any state of facts which they claim to be justified by the evidence, and to have the opinions of experts upon the facts so assumed. The question may embrace such facts as are claimed to be established by the evidence, and if the other side does not think all of the relevant facts are included in such questions it may include them in questions propounded on cross-examination."

Cleary, in Handbook of Illinois Evidence, § 1.12 (1956 Ed) says that the making of a timely and proper objection is essential in order to save for review a contention that evidence was erroneously admitted; and it is further stated:

"To be effective in saving error for review, objections must ordinarily specify the precise basis relied upon for exclusion. A general objection ordinarily raises only the question of relevancy, Buntain v. Bailey, 27 Ill 409 (1862), although it is possible that the circumstances may indicate sufficiently that the basis of an objection must have been apparent in the trial court, Massey v. Farmer's National Bank, 104 Ill 327 (1882). . . ."

It has been held that a physician may be asked on a hypothetical statement of the facts as to the manner in which an injury was received. 18 ILP Evidence § 330, and cases cited.

█ █ The objection made by the defendants that the question invaded the province of the jury is not tenable. In this court the defendants urge that the question was improper in that it failed to include a statement that the doctor was testifying to a "reasonable degree of medical certainty." Had the objection been specifically so phrased it could have been immediately corrected. Having not been so phrased, it has no avail in this court. A further reason why

the objection to the question cannot be considered by us is that in defendants' post-trial motion, their only objection to the hypothetical question is that the court erred in permitting counsel to ask of Dr. Woodhouse a hypothetical question as to a hypothetical person. That is not sufficient under the Practice Act, which provides that ". . . The post-trial motion must contain the points relied upon, particularly specifying the grounds in support thereof, . . ." and it is further provided that ". . . A party may not urge as error on review of the ruling on his post-trial motion any point, ground or relief not particularly specified in the motion." (Sec 68.1(2)) Richman Chemical Co. v. Lowenthal, 16 Ill App2d 568, 149 NE2d 351; Rubottom v. Crane Co., 302 Ill App 58, 23 NE2d 354.

█ The other objection urged by the defendants is that the medical testimony is purely speculative. It is true that there is some conflict in the testimony of the medical experts, but where there is such a conflict it is the duty of the trier of the fact to resolve it and to determine whose testimony they will believe.

In Jackson v. Whittinghill, 39 Ill App2d 315, 188 NE2d 337, a case in which the plaintiff complained of pain in her lower back as well as numbness in the outer side of her leg, the doctor suspected that the plaintiff had a ruptured disc. Subsequently, he so diagnosed the plaintiff's complaint and stated that he "thought" the plaintiff had a ruptured disc. The court said:

> ". . . We cannot accept defendant's position that plaintiff's injuries are merely 'speculative and possible.' While some of the symptomatology is of necessity subjective, we feel that medical testimony adduced on behalf of plaintiff is sufficient for the jury's consideration. An injury or its sequela need not be supported to the degree of scientific certainty suggested by defendant . . . .

We deem untenable the argument that the injuries claimed by plaintiff are speculative and not compensable. We find ample evidentiary basis for the implied finding that the injuries claimed were in fact suffered as a result of the collision . . ."

See also Lindroth v. Walgreen Co., 407 Ill 121, 94 NE 2d 847; and Melford v. Gaus & Brown Const. Co., Inc., 17 Ill App2d 497, 151 NE2d 128.

■ There is nothing in the record or in the cross-examination which would suggest that the opinion of Dr. Woodhouse is nothing but a guess. It is generally recognized that the statement of a physician as to his diagnosis of a diseased condition of a human body cannot be considered to be absolute. In fact, in many instances, the only way that a definite, positive diagnosis of a disease or injury can be made is by an autopsy after the death of the individual.

■ The defendants also insist that the verdict in favor of the plaintiff is so excessive as to evidence that it was the result of passion and prejudice, and bases that theory upon the fact that the total expenses proved by the plaintiff are approximately $248.28. The test is not the amount of out-of-pocket expenses. In Healy v. Nordhous, 40 Ill App2d 320, 188 NE2d 227, the defendant contended that since the only item of medical expense shown in the record was $75.00, damages in the amount of $3,000.00 were excessive. The court held that in their opinion the trial court was not influenced by passion and prejudice when reaching the verdict.

■ In the instant case, there was proper testimony that the injuries suffered by the plaintiff were permanent. There was testimony that since the time of the accident and at the present time, he had suffered from pain in the lower back and recurring headaches. If the jury believed, as they properly could,

the testimony of Dr. Woodhouse, indicating that in the future an operation might be required, the verdict was not excessive. In Barango v. Hedstrom Coal Co., 12 Ill App2d 118, 138 NE2d 829, we said:

"The amount of the judgment was high. The plaintiff's injuries were severe. There is no precise rule by which an award of damages can be fixed in an action for personal injuries because compensation for them does not lend itself to mathematical computation. In the case before us, the question of damages involves no question of the weighing of evidence. The only question presented to us is whether the jury on the evidence before them could have returned the verdict in issue. Here the trial court denied the motion for a new trial, and the denial by the trial court of a motion to set aside a verdict claimed to be excessive is entitled to weighty consideration. The responsibility rests upon a trial court to carefully consider the evidence in the case before it, and in a proper case where the verdict is excessive, to either enter a remittitur or grant a new trial. There is nothing in the record to indicate passion or prejudice on the part of the jury. The question before us is as to whether or not the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. . . ."

And in an article, "Damages in Accident Cases" by James, in 41 Cornell Law Quarterly 582, it is said:

"What then is compensation? The primary notion is that of repairing plaintiff's injury or of making him whole as nearly as that may be done by an award of money . . . . Sometimes this can be accomplished with a fair degree of accuracy. But obviously it cannot be done in anything but a

137

figurative and essentially speculative way for many of the consequences of personal injury."

The judgment of the Village Court of Maywood is affirmed.

Judgment affirmed.

ENGLISH, P. J. and DRUCKER, J., concur.