**The People of the State of Illinois, Plaintiff-Appellee, v. Richard L. Everist, Defendant-Appellant.**

### Gen. No. 49,703.

First District, Fourth Division.
September 9, 1964.
Rehearing denied October 5, 1964.

R. Eugene Pincham, of Chicago (Howard T. Savage, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James R. Thompson, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Defendant was tried before a jury and convicted of the involuntary manslaughter of two girls, and of drag racing. Judgments were entered on the verdicts of the jury and defendant was sentenced to two six-to-ten year penitentiary terms, and a one-year term in Cook County Jail, all to be served concurrently.

Defendant contends that he did not receive a fair trial; that the opinion of the state's expert witness was inadmissible; that the jury was improperly instructed; that it was prejudicial error for the Coroner's pathologist to describe the injuries causing the deaths of the two children; and that the state had knowingly used false testimony to obtain the convictions.

The evidence showed that on May 9, 1962, at about 9:30 p.m., the 52-year-old defendant stopped his south-

bound 1962 Ford Galaxie at a red traffic light at the intersection of Harlem and Armitage Avenues in Chicago in the lane adjacent to the western curb of Harlem Avenue. Next to defendant's car was a 1962 Chevrolet headed south and waiting for the light to change to green.

The evidence also discloses that at about the same time James Moreale stopped his 1957 Cadillac headed west somewhere between a stop sign and the east side of Harlem Avenue and Cortland Avenue which is one block south of Armitage Avenue. Moreale's wife sat on the passenger side of the front seat. In the rear seat were Roberta Menna, 11 years old, Paulette Menconi, 12 years old, and Moreale's only daughter, 12-year-old Deborah.

Moreale testified that "I drove west on Cortland to Oak Park Avenue, stopped and proceeded west on Cortland to Harlem where I stopped again. I looked to my left and no automobile was in sight. I looked to my right and I saw an automobile which would be to the north and I saw automobile lights approximately a block away. I proceeded across Harlem Avenue. I got to the west side of Harlem Avenue. My wife screamed we were going to be hit and that is all I remember." On cross-examination Moreale said that he "entered Harlem Avenue at a normal rate of speed from a standstill" and that when his wife screamed he stepped on the gas and "we were hit simultaneously."

Mrs. Moreale corroborated her husband's statement concerning the traffic conditions on Harlem. It was defendant's Ford which had collided with the Moreale Cadillac. Paulette Menconi and Deborah Moreale were fatally injured. The three other occupants of the Moreale automobile were hurt.

Albertus Woelfle testified that as he was approaching Armitage while driving his automobile south on

Harlem, he noticed two cars at the stoplight, the Ford on the curb side and the Chevrolet in the inner lane; that he was between 50 and 100 feet behind the cars when the light changed from amber to green; that "as I approached the light, the light changed from amber to green, and the two cars took off peeling rubber." In reply to a question as to the speed at which the cars were moving as they left the stoplight and reached a point about two-thirds of a block down, Woelfle stated, "I would say at least seventy miles an hour. . . ."

Eugene Quaglia testified that he was working at a gas station at the southeast corner of Harlem and Armitage at the time of the accident. As set forth in the abstract, Quaglia described the events:

> The cars were side by side and took off at a great rate of acceleration. I observed this for about two hundred or three hundred feet right in front of me. I was standing on the drive when they passed in front of me. There was no let up at all, just a slight pause when the engines let up and there was a constant rate of acceleration after that again. The cars were going south. These cars were within my clear visitation [sic] for about four hundred feet. After that, I could see the outline of the cars and the tail lights. The cars were almost abreast, side by side. They never changed from one lane to another for as long as I could see them. I turned around and I heard a tremendous impact. I turned around again in that direction and I saw a cloud of dust. I ran down to the corner of Cortland and Harlem. I noticed the Ford in the curb lane facing west. The Cadillac was up in the parking lot of Horwath's Restaurant on the northwest corner of Cortland and Harlem. I saw the people in the Cadillac.
> . . .

77

My opinion of the rate of speed is at least sixty miles an hour. I am referring to both cars.

Police Officer Carl Messina reached the scene about fifteen minutes after the collision. He described the scene:

I saw skid marks from some debris consisting of dirt, bits of glass, water and oil going in a straight line north which I measured at one hundred twenty-five feet. There were no other skid marks. On the southwest corner going over the curb and the sidewalk were tire marks, scuffing marks, sort of a whirl. The Cadillac was forty-five feet away from where the skid marks ended at the intersection. The Ford was forty-five feet from the end of the skid mark in the intersection.

Defendant testified that his speed never exceeded 35 miles an hour and that he had started in the curb lane, was cut off by the other car, started toward the second lane and the other car started toward it in front of him; that defendant started to pass the other car on its right when that car braked hard and suddenly veered left; that at this point defendant also braked hard and crashed into the Cadillac but did not see it before the crash. (The other car, the 1962 Chevrolet, avoided the crash; neither it nor its driver was located.)

On rebuttal, Harold J. Witthofe, defendant's superior at Continental Assurance Company, testified that he together with Mr. Dohrman, his assistant, and Mr. Townsend, one of the company's attorneys, visited defendant at the hospital two weeks after the accident. He further testified that when Townsend had asked how the accident happened, the defendant had replied that:

. . . he was going South on Harlem and was at the stop light on Armitage next to the curb.

78

There was a car next to his, light tan in color and which he thought was a Chevrolet. When the light turned green he beat the other car across the intersection after which he slowed down to 35 miles per hour. . . . The other car started to crowd me into the curb. . . . Well, I got mad and I opened up my three carbs.*

Witthofe also testified that when Townsend had asked how fast the other car was going, defendant had answered: "[H]e was going sixty or sixty five miles per hour" and that defendant further answered that he (the defendant) was gaining on him. Dohrman's testimony corroborated Witthofe's account of the hospital conversation.

Defendant's major contentions of error revolve about the testimony of the state's expert witness, J. Stannard Baker, whose qualifications were not questioned by defendant. Baker testified that in his opinion, based upon a hypothetical question, defendant's car was going 74 miles an hour at the point where his skid marks first appeared. Defendant argues that when there are occurrence witnesses, an expert's testimony is inadmissible citing Ficht v. Niedert Motor Service, Inc., 34 Ill App2d 360, 181 NE2d 386.**

 While speed is generally not considered a matter of expert opinion, it does not mean that experts cannot testify to it. In Fannon v. Morton, 228 Ill App 415, where the evidence as to the speed of an automobile was conflicting, it was held that it was not error to permit an expert to testify as to the probable speed of an automobile. As to the hypothetical ques-

---

* Defendant testified on cross-examination that: "My 1962 Ford Galaxie had a 390 cubic inch motor. I did not have power brakes or power steering. I had six-barrel carburetors for a 401 engine."

** In that case an expert's testimony about the course which a car took in making a left turn at an intersection was held inadmissible.

tion as a means of introducing such testimony, the court stated at page 426:

> If the appellant desired to insert elements omitted from the questions of appellee, he had a right to do so, but his failure to do so cannot be made a basis of reversal.

It was not error to allow the expert to testify as to speed. Since defendant made no objection to the hypothetical questions, he waived his right to object and cannot claim at the appellate level that error has been committed. People v. Trefonas, 9 Ill2d 92, 98, 136 NE2d 817. See O'Keefe v. Lithocolor Press, Inc., 49 Ill App 2d 123, 199 NE2d 60 (1964).

After the court had denied a motion of defendant for a directed verdict, a motion was made by defendant to strike the testimony of the expert on the ground that it was "based in part on facts that the witness assumed which is brought out in cross-examination." The court properly denied this motion —it certainly was not made in apt time.

Baker also testified on redirect examination that in his opinion it took the Moreale vehicle 1.6 seconds to travel across Harlem; that defendant's automobile was 300 feet north of the Cortland-Harlem intersection when the Moreale car entered the intersection, and that it took defendant's automobile 6.8 seconds to travel the 300 foot distance. Defendant argues the obvious fact that if these computations were correct, the accident could not have occurred. Defendant then urges that the judgments should be reversed because the state made no attempt to correct what it knew was a mistaken computation and cites Napue v. Illinois, 360 US 264.

In that case Napue was sentenced to 199 years for murder largely on the testimony of one Hammer, an accomplice. He testified that he had received no prom-

ise of consideration, although such promise had in fact been made by an Assistant State's Attorney. No effort was made to correct this false statement. The United States Supreme Court held that the failure of the prosecutor to correct the testimony which he "knew to be false" constituted a denial of due process of law. The facts of the Napue case suggest that the court was directing its attention to a situation in which false testimony was designedly used. There is no indication in the instant case that the State's Attorney and Baker were attempting to perpetrate fraud. The fact that Baker's estimation of 1.6 seconds was erroneous was inadvertent, not harmful to the defendant, and, if anything, tended to hurt the state's presentation.

██ Defendant claims error in the giving of Instruction No. 14.* We agree with the comment in Illinois Pattern Jury Instructions, page 29, that instructions on expert testimony are to be avoided but we do not consider the given instruction, after a modification thereof by defendant, to have been reversible error even though objected to in its final form. See State v. Eisenstein, 72 Ariz 320, 235 P2d 1011, 1018.

██ Everist also assigns as error the court's overruling of defendant's objections to the testimony of state's witness Woelfle that "the two cars took off

---

\* The court further instructs the jury that in this case there has been received as a part of the evidence the testimony of one J. Stannard Baker who has testified and given you his opinion upon certain assumed facts accepted by him as true, and upon which he has made computations applied to these assumed. You are instructed that such testimony is proper and competent concerning matters of special knowledge, skill or experience upon subjects which are not within the realm of ordinary experiences of mankind, and which require special training, study, skill and experience; but you are not bound to act upon the opinions and testimony of such a witness to the exclusion of other evidence in the case.

81

peeling rubber." Defendant claims that "peeling rubber" has no meaning to the average person. Nevertheless, in the cross-examination of Woelfle the same term was used twice by defendant's attorney. In addition, another state witness, Quaglia, was asked on cross-examination about observing other cars "peel rubber" and what he meant by it. He replied, ". . . I mean they spin their wheels as they drive out . . ." We believe the term was understandable and the objection to it properly overruled. A descriptive connotation of relative speed—flash of yellow—was held admissible in Acker v. Columbus & Southern Ohio Electric Co., 60 NE2d 932, 934 (Ohio App).

Furthermore, defendant claims that it was prejudicial error to elicit from the coroner's physician the extent of the injuries of the two dead girls as it was utilized solely to inflame the passion of the jury. Defendant concedes that testimony as to the cause of death is permissible but not the extent of injuries. Since such testimony can be instrumental in determining the force of impact, it is a predicate for inferring the speed of defendant's automobile. 11 American Jurisprudence, Proof of Facts, page 6 (1961). Such testimony was appropriate in this case since there was conflicting evidence as to the speed of defendant's vehicle.

Finally, defendant asserts that he did not have a fair trial because the rulings of the court were always to the detriment of defendant. Illustrative of this point is the following assertion made in defendant's brief:

> The court remained consistent in his sustension of every objection made by the state's attorneys— even where these objections were plainly invalid and without lawful reason. He remained true to

82

his course of overruling every defense objection and motion relating to the introduction of evidence before the jury—no matter how invalid nor how unlawfully prejudicial against defendant and his defense.

This blanket statement is inaccurate. The record indicates that during the course of the trial the court sustained defense objections at least 52 times and overruled state objections at least ten times.

In every bitterly fought adversary proceeding, an analytical, retrospective appraisal raises doubts about instantaneous decisions which must be made during its course. The defendant has questioned innumerable rulings of the trial court on the admissibility of evidence. We have examined them and find that the trial judge did not display any hostility or unfairness and did not commit any reversible error in the exercise of his discretion.

The judgments of the Criminal Court of Cook County are affirmed.

Affirmed.

ENGLISH, P. J. and McCORMICK, J., concur.