RUFUS HOUSE, Plaintiff-Appellee, *v.* SYLVIA STOCKER, Defendant-Appellant.—(HAROLD BROWN *et al.*, Defendants.)

(No. 74-86;

Third District—December 31, 1975.

Dunn, Stefanich, McGarry & Kennedy, Ltd., of Chicago (Harry D. Leinenweber, of counsel), for appellant.

Murphy, Timm, Lennon & Spesia, of Joliet (Kent Ayers, of counsel), for appellee.

Mr. JUSTICE BARRY delivered the opinion of the court:

On January 28, 1968, plaintiff was doing his family laundry as a customer at the laundromat at Cass Street in Joliet. The westerly wall of the laundromat room was made largely of glass and overlooked an adjacent

outside parking lot. While waiting for his laundry to finish, plaintiff sat in a chair inside the laundromat along the westerly glass wall facing eastward into the room. As defendant, Sylvia Stocker, was driving her automobile into the parking lot, her foot slipped from the brake to the accelerator causing the vehicle to drive over a parking bumper and through the glass window, striking and injuring plaintiff. At the close of all the evidence, the court directed a verdict in favor of all the defendants except Sylvia Stocker; the court then directed a verdict for plaintiff against defendant Sylvia Stocker and thereafter entered judgment on the jury's assessment of damages at $157,500. Defendant Stocker's post-trial motion was denied. On appeal, defendant Stocker claims that the court erred in directing a verdict and that the damages allowed are, in any event, excessive.

■■■ There is no dispute about how the accident happened. Defendant argues, however, that her foot "slipping off the brake" and onto the accelerator should not be characterized as negligence per se, and that the court erred in withdrawing from the jury the issue of whether such conduct was negligence. When plaintiff proved that defendant drove her automobile through the window of the laundromat and struck him, the duty shifted to defendant to show that it was there for some reason other than her own negligence. (*Sughero v. Jewel Tea Co.*, 37 Ill.2d 240, 226 N.E.2d 28 (1967); *Murphy v. Kumler*, 344 Ill.App. 287, 100 N.E.2d 660 (3d Dist. 1951).) Where an injury is shown to have been produced by an instrumentality which in the ordinary course of events would cause no such harm if those who have management of it used proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from want of proper care. The presumption is not proof and will yield to contrary proof, but we agree that defendant's explanation here that it occurred because she did not have control and because her foot slipped, does not overcome the presumption, and that the circuit court, under the *Pedrick* rule (37 Ill.2d 494, 229 N.E.2d 504 (1967)), correctly directed a verdict for plaintiff.

At the time of the accident, plaintiff was 37 years of age, married and the father of several children. He had completed about two-thirds of his college work by May 1953 when he was called for military service. He had been prominent in college as an athlete. After completing military service, he attended vocational high school to learn bricklaying, and thereafter became and has been a professional bricklayer in the Joliet area since 1963. Before the accident he was in good health, and allowing for weather conditions, worked for union wages an average of 9 months of every year getting 2 to 4 hours per week overtime. At the time of trial his life expectancy was 25.9 years.

Plaintiff testified that while he was sitting in the chair at the laundromat on the morning of the accident, everything suddenly "went out." When he came to his senses, he found himself stretched out on the floor under a clutter of shattered glass. He had no memory of seeing defendant's automobile but did remember that he tried to get up from the floor but couldn't, there being no strength in his legs. He felt sharp pains in his lower back, in both elbows and in his left knee. He was taken to Silver Cross Hospital immediately and after about an hour there was taken to his home where he was confined to bed for two weeks, being virtually unable, said he, to move any part of his body. The next day, however, he did see Dr. Wilson, the family physician and was referred by him to Dr. Rentschler, an orthopedist who has treated him ever since. The elbow pain left shortly, but about 6 to 8 weeks after the accident, plaintiff's right knee began to cause discomfort.

On April 10, 1968, plaintiff returned to work as a bricklayer on Dr. Rentschler's orders and continued until October 4, 1971. During that time he was not able to do more than half his usual work, according to his testimony. He terminated further efforts at this work on October 4 because it was too strenuous and aggravated his pain in the back and right knee. These pains became sharp and intense and caused vomiting. The work involved considerable lifting and bending in the handling of bricks weighing 3½ to 8 pounds and concrete blocks of 90 pounds. After terminating further efforts at bricklaying, he drove a cab for about a month but found continuous driving 8 or 9 hours a day a cause of discomfort to his knee, and on the advice of Dr. Rentschler, that he should develop another skill, he returned to Lewis College in 1972 as a full time student for a degree in sociology. He was, therefore, not employed during 1972 and 1973 and at the time of trial in March 1973 contemplated receiving a bachelor's degree the following May, and to pursue employment as a social worker. On an occasion in January 1973 when he was trying to change a tire, and had been bending over for a while, he found it difficult to straighten up, and continuously from then until trial time, had found the use of a cane helpful for his knee and back. His earnings in 1967 were $9100; in 1968, $9595; in 1969, $11,002.02; in 1970, $11,150.15; in 1971, $8651. Plaintiff's total medical expense was $995.80.

Frederick Schwartz, president and business agent for the bricklayer's union, Local No. 14, testified for plaintiff as to prevailing gross union wage rates in eight northwestern Illinois' counties for the years 1967 through 1972, and that they averaged about $9.87 per hour for 1972. In Will and Grundy Counties the rate for hours in excess of 40 per week is doubled; in the other counties the overtime rate is time and one-half.

Eugene Duff, professor of Economics at St. Francis College, testified

that the entry wage rate for persons entering social work with a bachelor's degree is approximately $8000 annually. He also testified that the Illinois Department of Public Aid has five grades of social workers, and that those who qualify can move to the top rate of $1550 per month although promotions would be slow without a master's degree. He indicated, however, that by executive order, preference in hiring is given to members of the Negro race like plaintiff, and that today's economy does have a demand for Negro men with college education, and that it is possible to earn a graduate degree entirely by night schooling.

Dr. Rentschler testified that he first saw plaintiff on January 30, 1968, when plaintiff was complaining of severe pain in any position and that it was aggravated by any walking, sitting, laying or bending but felt some better with heat. Plaintiff indicated to the doctor that the pain began in the area of his back and radiated into both lower extremities, greater in the left than in the right. The doctor diagnosed severe back contusion in the lumbar region with sprain and spasms, and contusion to both knees. The sprain refers to a ligamentous injury. Examination of the nerves of the lower extremities by reflection sensation and muscle power showed them intact. Dr. Rentschler prescribed a back brace to be worn whenever symptoms are present and recommended use of a bedboard. Within time, said the doctor, stability of the lumbar area can be regained by formation of scar tissue. In his last examination of plaintiff in 1973, there was some improvement noticed but the patient still complained of spasms in the lower lumbar area and tenderness in the knee. "The direct blow into the lumbar region has scarred down well," said the doctor, and "I don't believe it will give him difficulty." With respect to the right knee, the diagnosis was chondromalacosis patella which the doctor said means that the cartilage on the underside of the patella is no longer of normal quantity and is highly suggestive of a cartilage tear. An arthrogram was negative, however, but the doctor was of the opinion that that test is not conclusive. He also stated that he felt the knee has not given plaintiff sufficient trouble to justify surgery at this point although that might become necessary in the future. He considered plaintiff's condition as of the time of the last examination in 1973 to be permanent, and foresaw no possibility that plaintiff would be able to resume any occupation involving climbing, bending, lifting, crawling or prolonged standing or sitting. He indicated that a cartilage tear is not demonstrable by x-ray. The doctor expressed the opinion that in the near future, plaintiff will probably not require a great deal of medical treatment and that five or six times on the average in each year he may need infiltration and possibly physical therapy. The therapy is about $10 a

visit; the office calls with infiltration are about $20 each. He did anticipate that the cartilage condition in the knee would deteriorate.

Dr. Hedges, an orthopedic surgeon in Joliet since 1938 testified for defendant that on September 6, 1972, he had occasion to examine plaintiff in his office but found the effort somewhat frustrated by the fact that plaintiff would answer no questions as to where he hurt or the nature of his discomfort or disability, and made voluntary resistance in respect to tests involving ranges of motion. In respect to lower extremities, the doctor's findings were like those of Dr. Rentschler, that reflections were within normal limits, equal and active; no weakness or atrophy and nothing remarkable about circulation was found. When plaintiff's knee was not being examined, Doctor Hedges stated, he observed a normal range of motion; when it was being examined, the doctor said the patient resisted and would not move it. The straight leg test was 90 degrees bilaterally. The doctor could detect no evidence of muscle spasm in the lumbar-sacral area; x-rays of the lumbar-sacral spine and right knee were negative for pathological findings. He found no evidence of softening of the cartilage in the right knee. There was no objective evidence of any injury in his opinion. On cross-examination, Dr. Hedges said an x-ray would not show a tear to a ligament or damage to a nerve and that he couldn't say whether plaintiff suffers from any ligamentous injury to his knee or low back, but reaffirmed that his objective findings were negative.

In denying defendant's post-trial contention that the verdict is excessive, the circuit court relied on cases cited by plaintiff for the principle that the determination of damages in personal injury cases is a matter within the peculiar competence of a jury since no arithmetical computation of damages is possible, and because verdicts for a particular injury in other cases are only of general relevance. *Noncek v. Ram Tool Corp.*, 129 Ill.App.2d 320, 264 N.E.2d 440 (1st Dist. 1970) (where a verdict for $107,480 to a 42-year-old plaintiff was affirmed); *Trowbridge v. Chicago & Illinois Midland Ry. Co.*, 131 Ill.App.2d 707, 263 N.E.2d 619 (3rd Dist. 1970) (where a verdict of $72,500 in favor of a 41-year-old railroad worker was sustained); *Elizer v. Louisville & Nashville R.R. Co.*, 128 Ill.App.2d 249, 261 N.E.2d 827 (5th Dist. 1970) (verdict of $130,000 to a 24-year-old railroad worker approved); *Schutt v. Terminal Railroad Association*, 79 Ill.App.2d 69, 223 N.E.2d 284 (5th Dist. 1967) (verdict of $125,000 to a 38-year-old railroad worker sustained); and *Stephenson v. Air Products & Chemicals, Inc.*, 114 Ill.App.2d 124, 252 N.E.2d 366 (5th Dist. 1969) (verdict of $300,000 affirmed).

■■ The recognition that compensation for personal injuries does not

lend itself to mathematical computation, and that there exists no precise rule by which an award for damages can be exactly fixed, is not meant to imply that determinations by juries on the issue of damages transcend the power of review. In *Noncek,* as in the other cited cases, the verdict was left undisturbed not merely because it was the determination of a jury, but by reason of the additional essential finding on review that the verdict was within the range of what the evidence would reasonably support. A reviewing court has no power to intervene merely because the verdict is in excess of what the judges would have allowed had they heard the evidence and were to have made the original determination. (*Lau v. West Towns Bus Co.,* 16 Ill.2d 442, 158 N.E.2d 63 (1959).) But where it appears to a reviewing court that the award is beyond the flexible range of what is reasonably supported by the facts, and the court is convinced that it is excessive and out of due proportion to the injury and loss shown by the record, so that it demonstrates passion, prejudice or misapprehension, then it becomes the duty of the court to correct the error. Thus, in an annotation at 12 A.L.R.3d 117, 183-189 (1967), and the 1974 supplement thereto, the author summarizes 87 cases during the period 1951 through 1974 in which State and Federal courts have ordered remittiturs in suits in various jurisdictions in the United States where soft tissue injuries to the lower back were involved in combination with other injuries, including to the knees, when it was determined by the courts that the verdicts were so far beyond the range supported by the evidence as to indicate the intervention of error.

The facts and injuries in the foregoing cases cited by plaintiff seem entirely distinguishable from those here. None of them solely involves soft tissue contusions, spasms, sprains and abrasion with possible cartilage tear in a knee. One of them establishes permanent impairment of future earning ability by a sheet metal worker because of blindness caused by falling into a vat of copper cyanide; the evidence did not establish any training for intellectual pursuits (*Noncek,* where a verdict for $107,480 to a 42-year-old plaintiff was affirmed). Another of the cases cited contained evidence of x-rays demonstrating a narrowing of the segments between vertebrae at L-5 and S-1 with positive Laseque sign indicating sciatic nerve involvement, and atrophy of the left thigh (*Schutt,* where a verdict of $125,000 to a 38-year-old railroad worker was sustained). In a third instance, the record showed plaintiff sustained severe burns to the right leg from being immersed in scalding water, with secondary infections, many long hospitalizations and several surgical procedures for plastic and other corrective repairs (*Elizer,* where a verdict of $130,000 to a 24-year-old railroad worker was sustained). In *Trowbridge,* a verdict of $72,500 in favor of a 41-year-old railroad worker was sustained by

proof that several muscles in plaintiff's leg, about 6 inches above the ankle, were severed by a power saw and could not be repaired, causing a permanent foot drop and an impairment of the ability to move the foot inward or outward. There was also evidence of atrophy of plaintiff's leg below the scar, and that minor nerves and minor parts of the vascular system were affected so that plaintiff was industrially unemployable. In *Stephenson*, a 41-year-old painter sustained multiple injuries from two falls. The first was from a flagpole he was painting to a roof deck 20 to 25 feet below. Some years later, he fell from a walkboard extended between two ladders when his leg folded in consequence of a physical disability sustained in the first fall. X-rays revealed compression fractures of the right heel and ankle, atrophy of the right leg, loss of cervical lordosis and scoliosis. There was loss of left ankle reflex and limitation of motion on lateral bending. A diagnosis of psycho-physiological, musculo-skeletal disorder was also made by a psychiatrist and plaintiff was hospitalized for electric shock treatments. Plaintiff complained of headaches, pains in shoulders, neck, arms, loss of grip, pain in the leg, nervousness and insomnia, and had to wear orthopedic shoes. There was evidence of arthritic changes in the areas of injury and incidents of paralysis of the bowel. A verdict for $300,000 was affirmed as being within the range of the evidence.

In the case at bar, there is no evidence of lacerations of any kind; no evidence of any fractures or other bony disorders or of any vertebral or intervertebral changes; no atrophy, reflexes are normal and there is no evidence of any neurological involvement; no paralysis of bowels, no burns or loss of vision, no psychological disturbances or disfigurements or deformities; no periods of hospitalization or evidence of surgery; no large medical expense and no evidence with any reasonable degree of medical certainty that future surgery would be required or of the cost thereof; no evidence of any arthritic conditions, changes or aggravation; and no evidence of scoliosis. Although there was some evidence suggestive of a possible cartilage tear in the knee, plaintiff's doctor said of this that it had not given sufficient trouble to justify surgery, and only that it might become necessary in the future. None of plaintiff's evidence contradicts the testimony of Doctor Hedges that x-rays of the lumbar-sacral spine and right knee were negative for pathological findings. While plaintiff by reason of ligamentous injury is precluded from his occupation as a bricklayer or other heavy labor, the evidence also indicates that he is well educated and intellectually suited for work in a field where there exists a great demand for his services. While plaintiff in the case at bar, like some of the complainants in the foregoing cases which he cites, was advised to wear a lumbro-sacral corset and to use a cane

and bedboard, these facts in our judgment do not support the conclusion that the injuries in this case are parallel to or will support a verdict within the ranges of those reported in the cases upon which plaintiff relies.

Other reported cases involving ligamentous injuries to the lower back present a sharp contrast to those cited by plaintiff as to the ranges of verdicts that have been allowed by juries and approved or fixed by courts. In *Lewis v. Fidelity & Casualty Co.*, 230 So.2d 636 (La.App. 1970), a $75,000 award to a 40-year-old meat salesman was reduced to $50,000. Plaintiff had a right leg amputated below the hip due to prior cancer. In the accident complained of, he sustained a muscule-ligamentous sprain of the lumbar spine, musclo spasms of the cervical spine and a fracture of the first cervical vertebra, and developed severe headaches. His condition precluded any work requiring standing or driving for appreciable lengths of time and any but light work. In *O'Keefe v. Lithocolor Press, Inc.*, 49 Ill.App.2d 123, 199 N.E.2d 60 (1st Dist. 1964), a verdict of $15,000 was approved in favor of a 25-year-old plaintiff who sustained soft tissue injury to the muscles and ligaments of the back. Later the muscle spasticity caused scoliosis which was demonstrable by x-ray. The pain radiated into his left leg. Approximately a year after the accident there were significant changes in the measurement of the right calf, depression of the right ankle reflex and bi-lateral limitation of the straight leg raising of 20 degrees which led to a diagnosis of herniated intervertebral disc. In *Miller v. DeWitt*, 59 Ill.App.2d 38, 208 N.E.2d 249 (4th Dist. 1965), a verdict of $30,000 was approved where plaintiff sustained soft tissue back injury with a comminuted fracture of the left heel with some residual deformity. The total medical expenses were $650 and loss of income was $5000 although plaintiff would also be limited in his activities in his former occupation as an architectural engineer who was accustomed to climbing on his job. In *Pomrenke v. Betzelberger*, 41 Ill.App.2d 307, 190 N.E.2d 522 (3d Dist. 1963), a $15,000 verdict was approved to a 53-year-old plaintiff who in addition to soft tissue back injury received severe facial lacerations requiring 60 to 70 stitches both inside and outside his cheek which was disfiguring and caused loss of sensation, difficulty in eating or controlling loss of saliva, and caused a twitching in his cheek. He also sustained a bump on his right knee and a brain concussion. A judgment of $9000 was approved in *Jackson v. Whittinghill*, 39 Ill.App.2d 315, 188 N.E.2d 337 (3d Dist. 1963) where a 36-year-old housewife who boarded eight college students sustained injury to her back and right knee. She underwent surgery for excision of the torn cartilage from the knee but x-rays of her back were negative for any bony pathology. The low back pains continued, however, and later ex-

amination showed decreased sensation on the top of plaintiff's foot and on the outer right calf which was indicative of ruptured disc. She wore a back brace and slept on a hard bed and used sedatives. Surgical intervention was a possible alternative. She was precluded permanently from hard labor including lifting tubs of laundry to do her former work. Medical expenses were $1102.25, and anticipated future medical expense was $1200 to $1500. In *Reed v. Knol,* 7 Ill.App.3d 163, 287 N.E.2d 238 (1st Dist. 1972), plaintiff sustained multiple lacerations of the face, scalp and knee which necessitated 50 stitches to her face and 10 to her knee, leaving scars and a drooping eyelid, contusions and internal injury to the right knee, spasms in the lower back which were a source of constant pain and a concussion which caused headaches. The lower court reduced a $15,000 verdict to $9,000 and the appellate court affirmed. In *Crawley v. Chicago Transit Authority,* 128 Ill.App.2d 219, 262 N.E.2d 762 (1st Dist. 1970), plaintiff sustained soft tissue injuries to the cervical and lumbar areas of her spine and a contused chest all of which were treated conservatively for $201.55. She made a satisfactory recovery. An award of *$1500* was approved. In *Bail v. Cunningham Bros., Inc.,* 452 F.2d 182 (7th Cir. 1971), a 52-year-old brick mason received an award of $150,000, but not for soft tissue injury. He sustained a compound fracture of the nose, compound fracture of the left and right ankles requiring pins, screw and Rush nails. The evidence showed he would suffer from traumatic arthritis at the fracture sites and due to limitations of plantar and dorsal flexion in both feet, was permanently precluded from working as a brick mason. In *River v. Atlantic & Pacific Tea Co.,* 31 Ill.App.2d 232, 175 N.E.2d 593 (4th Dist. 1961), plaintiff sustained low back soft tissue injury and injury to her right knee. She had to wear a back support. An award of *$4000* was approved. In *Wells v. Gulf, Mobile & Ohio R.R. Co.,* 82 Ill.App.2d 30, 226 N.E.2d 662 (5th Dist. 1967), a 39.6-year-old pipe fitter with a life expectancy of 385 months received a lumbar muscular strain which resulted in an aggravated arthritic condition making him permanently unemployable industrially. A verdict of *$75,000* was approved. There was no evidence that he was qualified for any other employment. In *Kiddy v. Toledo, Peoria & Western R.R. Co.,* 128 Ill.App.2d 200, 261 N.E.2d 541 (3d Dist. 1970), a 63-year-old railroad worker complained of muscle spasms in the back which aggravated a pre-existing osteoarthritic condition. He had been unable to work for 6 years preceding trial at a wage loss of $40,000 to $45,000. A verdict for *$53,800* was approved.

Other cases involving injury to the ligaments of the low back with additional complaints are reported in the same annotation at 12 A.L.R.3d 117, 161, § 4 (1967), and in the 1974 supplement. In 74 of the cases re-

ported during the period from 1951 to 1974 where damages were fixed by the court, only 6 involve awards in excess of $10,000; the rest range between $10,000 and $50. The six in excess of $10,000 are *Kelly v. United States*, 230 F.Supp. 118 (D.C. Ark. 1964) ($75,000); *Carroll v. Lanza*, 116 F.Supp. 491 (D.C. Ark 1953) ($18,000), *aff'd in part and rev'd in part on other grounds*, 216 F.2d 808 (8th Cir. 1954), *rev'd on other grounds*, 349 U.S. 408, 99 L.Ed. 1183, 75 S.Ct. 804 (1955); *Godfrey v. United States*, 248 F.Supp. 273 (D.C. Cal. 1965) ($17,549); *Bonner v. United States*, 339 F.Supp. 640 (D.C. La. 1972) ($404,022.17); and *Browning v. United States*, 361 F.Supp. 17 (D.C. Penn. 1973) ($84,443). In *Kelly*, the award was for $75,000 to a 52-year-old man injured in an automobile collision. In addition to injuries to the lumbar and cervical spine, he sustained serious brain injuries and comminuted fracture of the left knee cap extending into the joint which required open reduction and the wiring together of several pieces of bone. He had been a school superintendent, had a life expectancy of 21¼ years and was permanently disabled from gainful employment unless at jobs requiring neither intellectual or physical effort. In *Carroll*, a 53-year-old painter in addition to low back strain sustained comminuted fracture of both forearm bones, sprained shoulder, urinary trouble and lung infection. An award of $18,000 was approved. In *Bonner* ($404,022.17), and *Browning* ($84,443) the injuries were considerably more serious than those involved here and medical costs were substantial. In *Bonner*, plaintiff was made grotesque in appearance and the award included $147,367.17 for future care.

Out of approximately 439 cases summarized in the annotation where verdicts for back injuries were held *not excessive*, only 15 involve awards in excess of *$50,000*, and these 15 involve spinal fractures; or injury to a testicle; osteoarthritis; loss of lordotic curve; injury to portion of brain stem that controls eye-convergence function; amputation of legs, comminuted fracture of breastbone (*Smith v. Illinois Central R.R. Co.*, 343 Ill.App. 593, 99 N.E.2d 717 (1st Dist. 1951); traumatic neurosis with anesthesia of lower leg; herniated discs; sexual impotency; broken nose and lacerations; fracture of transverse process of third lumbar vertebra; engagement and compression of left ureter by scar tissue from fracture necessitating spinal fusion and surgery; and aggravation of previous spondylolisthesis.

Twenty-eight cases dating from 1967 through 1974 are summarized in the supplement to the annotation, all but one of which involve remittiturs where verdicts were held *excessive*. Of these 28 cases, only 3 involved verdicts in excess of $50,000. In *Lewis v. Fidelity & Casualty Co.*, discussed *supra*, a verdict for $75,000 was reduced to $50,000. In *Viator v.*

*Gilbert*, 206 So.2d 106 (La.App. 1968), an award to a 34-year-old laborer of $59,200 for severe lumbro-sacral sprain, moderate cervical sprain and aggravation at the site of an attempted bone fusion was reduced to $27,270. The third case involved an award of $350,000 which was also held excessive. No remittitur was ordered in that case, however, but the cause was remanded for a new trial. *Perry v. Bertsch*, 441 F.2d 939 (8th Cir. 1971).

■■ We recognize that the propriety of the damages awarded by the verdict in the instant case cannot be determined by a mere comparison with verdicts in other cases at other times and other places. (*McNellis v. Combustion Engineering, Inc.*, 13 Ill.App.3d 733, 301 N.E.2d 96 (1st Dist. 1973).) But having deliberated considerably over the fact that the circuit judge did give his approval to the verdict in this case, we deemed it helpful, making allowances for the differences in times, to make comparative examination of verdicts in many cases involving similar injuries for purpose of confirming the reliability of our own judicial conscience which was and is persuaded that the verdict here is too far beyond the flexible limits of what the proof reasonably supports for us to lend our concurrence. Having great respect for the opinion of the circuit court, and viewing the evidence in the light most favorable to the verdict, we nonetheless decide that the verdict is not merely in excess of what each of us might allow or approve were we to have made the original determination, we deem it so out of proportion to the injury and loss shown by the record as to be palpably erroneous.

■■ We believe, as has been expressed many times, that "assessment of damages is the preeminent function of the jury * * * and [that] their verdicts based on their assessments must not be set aside unless clearly the result of passion and prejudice." (*Goertz v. Chicago & North Western Ry. Co.*, 19 Ill.App.2d 261, 276, 153 N.E.2d 486, 494 (concurring opinion of Mr. Justice Kiley (1st Dist. 1958).) Accepting that norm and recognizing that the error has not affected the issue of liability, we find it appropriate to affirm on condition that plaintiff remit part of the recovery. (*Horns v. Johnson*, 17 Ill.App.2d 314, 149 N.E.2d 437 (2nd Dist. 1958).) We find the verdict so excessive in amount as to demonstrate some misdirection, misapprehension, passion or prejudice on the part of the jury, derived perhaps from a confusion as to the meaning of court's instruction directing a verdict for plaintiff. Further we believe a remittitur is appropriate where, as here, the record demonstrates the amount awarded to be so out of proportion to the loss sustained as to demonstrate palpable error.

Therefore by authority of the provisions of Supreme Court Rule 366 (a)(5) (Ill. Rev. Stat. 1973, ch. 110A, § 366(a)(5)), we affirm the judg-

ment on the express condition that plaintiff enter a remittitur of $50,000. Upon the filing of such remittitur, the judgment will be affirmed; otherwise the amount of the judgment for plaintiff will be vacated and the cause will be remanded for a new trial limited to the issue of damages only.

Judgment affirmed upon filing consent to remittitur within 14 days after the mandate goes down; otherwise, the judgment is affirmed in part and reversed in part and remanded for a new trial on the limited issue of damages only.

ALLOY and STENGEL, JJ., concur.