Mary Sommese, Plaintiff-Appellee, v. Maling Brothers, Inc., a Corporation, Defendant-Appellant.

Gen. No. 50,286.

First District, First Division.

December 13, 1965.

Jacobs and McKenna, of Chicago (Lloyd E. Williams, Jr. and Barry L. Kroll, of counsel), for appellant.

Gunther & Choka, of Chicago (John M. Janewicz, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

Defendant appeals from a $25,000 verdict and judgment awarded plaintiff, Mary Sommese, for personal injuries alleged to have been sustained when, on a rainy day, plaintiff, a prospective customer, fell in an entryway of defendant's store. In answer to a special interrogatory, the jury found plaintiff not guilty "of any contributory negligence which was a proximate cause of said occurrence."

Defendant's contentions are: (1) Defendant was not shown to be negligent. (2) Plaintiff was guilty of contributory negligence as a matter of law. (3) The verdict and answer to the interrogatory were against the manifest weight of the evidence. (4) Prejudicial trial errors were committed.

Plaintiff's action is based on the contention that defendant failed to provide a safe means of entrance for a business invitee and was negligent by one or more of the following acts: (a) It used a type of marble terrazzo flooring not suited for outdoor use. (b) It failed to use any abrasive in the terrazzo. (c) It failed to remove the accumulated water. (d) It failed to use rubber mats. (e) It failed to warn plaintiff that its entryway was dangerously slippery.

On February 27, 1958, plaintiff was 28 years of age. The kneecap of her left leg had been surgically removed less than three months previous. She was able to walk without assistance, do most of her own housework, and partake in recreational activities. She walked without a limp and suffered no pain or weakness of any kind. She was due to return to her employment within several days.

On the date in question, and after having had lunch with a friend, plaintiff walked into the south end of the "Harlem-Irving Plaza" and walked three and one-half blocks to defendant's store at the north end of the Plaza. It had been raining periodically throughout the day. During lunch it rained quite heavily, and while

plaintiff was walking through the Plaza it was drizzling. Plaintiff was without a raincoat, umbrella, galoshes or rubbers. She was wearing shoes with a "stack heel" about an inch and one half to two inches. The soles of her shoes had been "roughed up" by her husband with light sandpaper.

When plaintiff arrived at Maling's, she took a look at the front windows. "I knew the shoes I wanted. . . . They were put on display in the window. . . . I saw the shoes and then I started into the store. So as I continued walking on in, my foot slipped, the right leg, out in front of me . . . and I went down with my left leg completely under my body and the right leg out in front of me. . . . I felt my right leg slipping and I had tried to brace myself against the left window . . . and I just couldn't reach it."

On cross-examination, she testified, "When I turned the corner and started up into this entryway, it was wet. I saw water when I was just starting to walk into the entryway. The water began right at the edge of the sidewalk more or less continuing on to about halfway. . . . When I turned the corner and walked in there, the water that I saw on the floor, to my knowledge, extended all the way across. . . . I was standing in water. I would say it covered the whole sole of my shoe. . . . I had no trouble seeing in there. . . . The water appeared to be the same consistency all over. . . . I was aware of the fact that there was another entryway to the store. I knew that when I came up to the front of the store. . . . I have no idea whether the water came from rain or whether it was tracked in. All I know, it was wet. . . . I was looking at the floor. I saw it was wet. It looked very glassy. I didn't know it was slippery." She saw no "depression or indentation in the entryway." The evidence indicates there was a slight incline from the door down to the sidewalk.

Plaintiff's expert witness stated that he had been in the architectural profession for fifteen years. He had examined the floor surface visually and by feeling it with his hands. He testified that "it is a known fact that terrazzo, upon becoming wet, is very slippery. And I would not have used this type of installation for this entryway, without the addition of an abrasive material added to the mortar mix." He also testified that he wetted the surface and rubbed it to see if he could detect any abrasive material. He stated, "If any abrasive material had been added it would have been apparent to my examination. . . . From that examination I could not tell that there was any abrasive material added." The witness further stated he had used that type of floor "for interior uses" since "upon becoming wet it becomes very slippery and it is hazardous. . . . Often mats are used on top of the terrazzo to prevent its hazardousness on a rainy day."

Five defense witnesses testified as to the occurrence and the floor condition at that time. *A Cashier* in the store, whose station was just inside the door of the south entryway, stated she did not see plaintiff fall. She saw plaintiff standing in front of the store by the corner of the window. When she next noticed plaintiff, she was lying on the ground with her head on the sidewalk and her feet partially in the entryway. She could not see any puddles or collection of water in the entrance. There were no indentations or depressions in the floor. It had rained that morning, and it was drizzling in the afternoon and the wind was blowing. The store had no rubber mat to put down in the entryway when wet.

*Defendant's assistant manager* testified that when he first saw plaintiff, she was lying on the sidewalk in front of the store. He did not recall seeing any puddles, large accumulations of water, indentations or depressions in the surface. *A village employee* testified that he was driving through the shopping center about noon and

happened to see a woman standing near the showcase at Maling's and just falling down or dropping down by the case. "It was a little slippery and a little wet from the mist where the people would track in the water as they were walking in and out of the store there. As to whether there were any large accumulations or puddles of water, no, there was no water or anything in there. . . . The floor was a little misty. . . . I walked over those spots with the woman when I walked her into the store and I had to walk back out again. This was slippery." *The Plaza maintenance engineer* said, "To my knowledge there were no puddles." *The Village Chief of Police* said that he was called to the scene of the occurrence and did not see any puddles, accumulations of water, indentations or holes.

Defendant's expert witness testified that he was a Professor of Metallurgical Engineering since 1954. He examined the floor with a machine used for testing slipperiness. It is a pendulum which attempts to simulate the glancing blow struck against the floor by a human foot wearing a shoe. The pendulum is started at an angle of 45 degrees and, therefore, if it faced no resistance, would swing up to 45 degrees on the other side. He tested a terrazzo, vinyl tile, ceramic tile, oak tile and asphalt tile floor. He stated that "the figure we came up with on the unworn spot in the Maling's lobby when wet was an angle of 33 degrees. That is how far the pendulum swung on the upswing. The figures that I am giving you are the average of several tests on each floor. On the terrazzo floor the figure was 30 degrees. The figure for vinyl tile was 32 degrees and for ceramic tile was 26 degrees. The oak tile was 30 degrees. The asphalt tile was 35 degrees. These figures when taken together represent the relative slipperiness of each of these floors under circumstances under which I tested them. These figures represent the angle achieved on unworn wet surfaces for each of these types of floors."

■■ Initially, defendant argues, "The law in Illinois has continually and consistently been that, upon a showing such as this, the defendant, as a matter of law, is entitled to a verdict." Defendant asserts that the trial court was in error in failing to enter judgment for the defendant, either by granting a motion for a directed verdict or by granting defendant's motion for judgment notwithstanding the verdict. This presents the single question whether there was, in the record, any evidence which, standing alone and taken with all its intendments most favorable to plaintiff, tended to prove the material elements of her case. Evidence favorable to plaintiff's case was all that could be considered by the trial court in this inquiry. (Garrett v. S. N. Nielsen Co., 49 Ill App2d 422, 426, 200 NE2d 81 (1964).) If there was a total failure to prove one or more of the essential elements of plaintiff's case, specifically, as contended by defendant, due care on her part or negligence on the part of the defendant, the motion should have been allowed. Statements made in Carter v. Winter, 32 Ill2d 275, 204 NE2d 755 (1965), are in point (p 282):

> "In determining whether defendants' motion for a directed verdict should have been allowed, all of the evidence, when viewed most favorably to plaintiff, must totally fail to establish one or more essential elements of the case. . . . That proof by plaintiff of his own exercise of due care is essential to recovery is elementary. . . . [p 283] In our judgment, plaintiff's own testimony . . . when viewed in the light of the rest of his testimony and that of the other witnesses, conclusively establishes his guilt of contributory negilgence as a matter of law. One cannot knowingly expose himself to danger and subsequently recover damages for an injury which, by the employment of reasonable precaution and circumspection, he might have entirely avoided."

On this issue, defendant relies primarily on Murray v. Bedell Co., 256 Ill App 247 (1930) ; Clark v. Carson Pirie Scott & Co., 340 Ill App 260, 91 NE2d 452 (1950) ; Hartman v. Goldblatt Bros., Inc., 19 Ill App2d 563, 154 NE2d 872 (1958) ; and Brunet v. S. S. Kresge Co., 115 F2d 713 (CA 7th).

Defendant also cites authorities from many other jurisdictions which are substantially in accord with the statements made in Murray v. Bedell Co., 256 Ill App 247, where, in reversing a plaintiff's jury verdict holding that a verdict should, as a matter of law, have been directed for the defendant, the court said (pp 249–251) :

"The question appears to be whether or not, under such circumstances, a merchant is liable to an invitee upon such premises, where such invitee is caused to slip and fall by reason of mud and water upon the flooring of such a vestibule or entry. From the testimony of the plaintiff it is apparent that the danger, if any, was clearly evident to her, as well as the defendants, and that she was aware of the condition and of the possibility of sustaining a fall before she undertook to pass over and along the floor space of the vestibule. The condition described by the witnesses is one that is not only not unusual, but is customarily to be found on such days as described in the testimony, in vestibules of this character and the sidewalks and the premises surrounding entrances to public places. . . . In the case at bar the plaintiff was as well apprised of the condition existing in the vestibule as the defendant, and should be held to as high a degree of care for her own safety as would be required of the defendant. . . . We find that the facts show no such evidence of negligence on the part of the defendant as would be actionable at law."

231

In Hartman v. Goldblatt Bros., Inc., 19 Ill App2d 563, 154 NE2d 872, the court said (pp 566–68):

"Under these weather conditions is the owner of a store guilty of negligence merely from a wetness on the floor, when it does not involve any accumulation of water, ice, snow, or debris? The basis of recovery in personal injury cases is not merely that an injury was sustained, but that an injury was sustained because of the negligence of defendant. . . . Here there is neither allegation nor testimony that there were any hidden dangers. The wetness of concrete on which plaintiff slipped was plainly visible to all persons. . . . It is clear from the cases discussed above that the condition alleged and proved did not constitute negligence. There was no breach of duty which defendant owed, nor did the condition indicate any absence of care according to the circumstances."

In Brunet v. S. S. Kresge Co., 115 F2d 713, the court said (p 715):

"It is obvious in the case at bar that nothing was hidden from appellee, that she was well aware of the slippery and wet condition of the stairway as she started to descend it. She stated that she took hold of the banister as she started down because she realized that there was a possibility of falling. She presumed that her own galoshes were wet as she entered the store, having walked through the slush and snow, and she could see that there was slush and snow on the stairs tracked in by other people."

Plaintiff asserts that many of the cases cited by defendant include factors not present here. We note that in Murray v. Bedell Co., the court said (pp 248, 249):

"There appears from the evidence to have been no defect in the manner in which this vestibule or

entry was constructed. . . . [S]he noticed that there was mud and water on the flooring and that there was a slight incline, and *that she knew that she would have to be careful."* [Emphasis supplied.]

Also, in that case, defendant's doorman testified that "he squeegeed the vestibule" several times before the occurrence, and the court, after relating all of the foregoing, said (p 249) :

"The question appears to be whether or not, under such circumstances, a merchant is liable to an invitee upon such premises."

In Hartman v. Goldblatt Bros., Inc., the court said (p 567) :

"Here there is neither allegation nor testimony that there were any hidden dangers. The witness of the concrete on which plaintiff slipped was plainly visible to all persons."

In Brunet v. S. S. Kresge Co., the court, in discussing the duties of a storekeeper, said (p 715) :

". . . and if there are hidden dangers upon the premises, he must use ordinary care to give persons rightfully upon the premises warning thereof. . . ."

Plaintiff argues that the evidence in the instant case established "that the entry was unsafe, that defendant had knowledge of the composition of its floor, and that no warning was given. It is clear that under Illinois law, as stated in the cases cited by defendant, the customer may recover from the storekeeper for injuries sustained as a result of the unsafe condition of defendant's floor."

As to affirmances of verdicts against defendants where plaintiffs fell on slippery inclines, plaintiff cites Lubin v. Goldblatt Bros., Inc., 37 Ill App2d 437, 186 NE2d 64 (1962) ; Burg v. Great Atlantic & Pacific Tea Co., 256 F2d 613 (7th C, 1958). Also, Minters v. Mid-City Man-

233

agement Corp., 331 Ill App 64, 72 NE2d 729 (1947), where plaintiff slipped and fell on a floor which was being mopped and dried. There, the court said (p 71) :

"If there is any evidence, more than a scintilla, tending to prove the material averments of the complaint then it cannot be held, as a matter of law, that there is no liability where the suit is based on the claim of defendant's negligence. . . . If there be any difference of opinion on the question so that reasonable minds may not arrive at the same conclusion, then the question is one of fact for the jury. . . . And even where there is no dispute in the evidence but where inconsistent conclusions may legitimately be drawn the question is also one for the jury. . . . What is negligence or contributory negligence cannot be defined in exact terms. Each case must be determined from its particular facts."

Plaintiff also asserts "the importance of defendant's failure to take any precautions to either remove or reduce the hazard created by the accumulated water is emphasized by its failure to employ an abrasive in the terrazzo. Without an abrasive it is very slippery. Without an abrasive and wet, it is hazardous." To support this statement, plaintiff cites authorities from other jurisdictions, including DeWeese v. J. C. Penney Co., 5 Utah2d 116, 297 P2d 898 (1956) ; Brody v. Albert Lifson & Sons, 17 NJ 383, 111 A2d 504 (1955) ; and Cardall v. Shartenberg's, Inc., 69 RI 97, 31 A2d 12 (1943).

In DeWeese v. J. C. Penney Co., the "terrazzo" entrance of defendant's store, which sloped upward, was "wet and had muddy tracks upon it," and it was undisputed that there were no rubber mats or abrasives on the floor at that time. The court said (pp 900, 901) :

"[The expert witness'] testimony was to the effect that all terrazzo surfacing becomes slick when wet, and that abrasives are used in the composition to

234

roughen it. It is not amiss to permit him to refer to his specific knowledge or observation of particular surfaces in implementation and illustration of his statement that such abrasives were necessary and were customarily used. . . .

"The essential inquiry relating to defendant's negligence is whether in performing its duty of due care just recited, it knew or should have known, that a dangerous condition existed and whether sufficient time elapsed thereafter that, in due care, it should have put out the mats or sprinkled feldspar on the surface to reduce the slipperiness. . . .

"The argument is made that the effect of affirmance of this judgment will be to make stores such as defendant insurers of the safety of their patrons, which argument we reject. . . . We are only required to determine whether there was any legitimate basis in the evidence upon which reasonable minds could believe that the defendant failed to meet its standard of reasonable care under the circumstances for the safety of its customers."

As to due care on plaintiff's part, the court said (p 902) :

"Mrs. DeWeese was entitled to assume that the floor was reasonably safe. Though she saw dampness and muddy tracks thereon, there was nothing to give her warning that it was particularly slippery when wet and there is no evidence that she was familiar with such fact. . . . Her testimony is susceptible of interpretation that she used the degree of care which ordinary and reasonable persons observe under such circumstances, which was the measure of her duty."

In Brody v. Albert Lifson & Sons, plaintiff fell on a wet terrazzo floor, which contained no abrasive. There, the court said (p 507) :

235

"[T]here was evidence from which a jury could reasonably infer that the construction of the floor rendered it peculiarly liable to become slippery by virtue of introduction of water thereon and that the defendant omitted precautions which would have been practical or reasonable under the circumstances of this case."

■ ■ Examining the testimony presented in this case, together with all reasonable inferences legitimately arising therefrom and viewed from its aspect most favorable to plaintiff, we are not persuaded that there has been a total failure of proof of lack of due care on behalf of plaintiff or of negligence on the part of the defendant. As to due care, we believe reasonable men might differ as to whether plaintiff used that degree of care which ordinary and reasonable persons would have observed under the circumstances presented to her that day. It had been raining or drizzling most of the day. Plaintiff had walked three and one-half blocks in the Plaza to reach defendant's store. It is a fair inference that she traveled this distance on wet surfaces, pavements or sidewalks, safely and without incident. On arrival at Maling's store, she looked in the front windows, saw the shoes she wanted, and then started into the store. She saw the entryway was wet, "it looked very glassy," and she saw no depression or indentation in the entryway. She noticed, also, there was a slight incline from the door down to the sidewalk. She testified that she did not know the floor was "terrazzo" without an abrasive, or that terrazzo without an abrasive and wet is "hazardous." Reasonable men might differ as to whether plaintiff was entitled to assume that, after having walked three and one-half blocks on wet surfaces, the vestibule floor was reasonably safe to walk on, and that plaintiff was in the exercise of due care in proceeding into defendant's vestibule. Questions which are

236

composed of factors sufficient to cause reasonable men to arrive at different results should not be determined as matters of law. (Petricek v. Elgin, J. & E. Ry. Co., 21 Ill App2d 60, 68, 157 NE2d 421 (1959).) Whether plaintiff exercised that degree of care which was proportionate to the danger known to her at that time was a question for the jury.

■ On the issue of defendant's negligence, it is not disputed that the entryway was of terrazzo composition with a smooth sloping surface, and that it had been raining or drizzling for some time, and some moisture had accumulated on the floor. Defendant did not mop or "squeegee" the surface or use any mats when the entryway was wet. The testimony of plaintiff's expert witness was to the effect that he failed to detect any abrasive material on the surface of the floor, and that without abrasive material, exterior "terrazzo" floors, when wet, become very slippery and are "hazardous." Whether it was negligence on the part of defendant, under the conditions portrayed by plaintiff, to fail to place rubber mats or mop or "squeegee" its terrazzo vestibule floor, which apparently did not contain abrasives, was a question for the jury.

■ We are not holding that defendant's conduct amounted to negligence as a matter of law. We are only determining that there was a legitimate basis in the evidence upon which reasonable minds could believe that the defendant failed to meet its standard of reasonable care, under the circumstances, for the safety of its customers. DeWeese v. J. C. Penney Co. (Utah), 297 P2d 898 (1956).

We next consider defendant's contention that the verdict is against the manifest weight of the evidence. Defendant argues that "plaintiff places the situs of her fall at a point about halfway in the entryway. Arrayed against this is the testimony of three disinterested witnesses, . . . The testimony regarding the condition of

237

the entryway is even more antagonistic to plaintiff's recovery."

As to the situs of plaintiff's fall, the record shows extensive examination of all witnesses on this issue. Defendant's witnesses are not in accord as to where plaintiff was lying after her fall. The cashier said plaintiff was lying on the ground with her head on the sidewalk and her feet partially in the doorway. The assistant manager said she was lying on the sidewalk in front of the store. The village employee saw her in the process of falling, and she fell "right here on the corner where I am marking with a red pencil. . . . The lady's head was facing south, up against the window."

■ The cross-examination of plaintiff as to the condition of the entryway shows some discrepancy as to how much water had accumulated, its extent, and whether it touched the bottom of or whole sole of her shoes. These variations in plaintiff's testimony and what probative value was contained in her testimony were jury questions, to be determined by the jury's judgment of her credibility and the weight to be given to her testimony.

[8] We have examined, also, the colloquy between court and counsel which ensued when defendant's counsel, for the purpose of impeachment, sought to question plaintiff about her answers given in a deposition taken some time before the trial. We find no abuse of discretion in the court's ruling that her deposition answers as to the depth of the water were not impeaching.

■ ■ Under the law, we cannot disturb the verdict of the jury unless it is clearly against the manifest weight of the evidence. Manifest means clearly evident, clear, plain, indisputable. (Black v. DeWitt, 55 Ill App2d 220, 225, 204 NE2d 820 (1965).) From our examination of this record, we do not consider this to be a case in which an opposite conclusion to that of the jury is clearly evident. We find no merit in this contention.

■■■ Defendant next contends that prejudicial error was committed by plaintiff's counsel in his closing argument to the jury "in explaining the significance and effect of the special interrogatory to the jury." Plaintiff's counsel told the jury that the special interrogatory had been submitted by the defendant; that the answer of the jury to the special interrogatory "supersedes the verdict"; and that the jury should harmonize their answer to the interrogatory with their verdict so as not to "deprive this woman of any right to recovery."

In support of this contention, defendant cites Williams v. Norman, 347 Ill App 181, 106 NE2d 378 (1952) (Abstract opinion), where the Appellate Court reversed a plaintiff's verdict because plaintiff's attorney, in argument to the jury, stated specifically that a special interrogatory had been submitted by defendant through his attorney and then proceeded to present an argument to the jury as to what should be done with such interrogatory. After noting that an objection and motion for a mistrial were made and denied "at such time," the court said:

> "While it is proper for an attorney to argue the facts of the case, and discuss the evidence for the purpose of convincing the jury that under the evidence the interrogatory should be answered either in the affirmative or the negative, as the case may be, it was highly improper for the attorney to specify that the interrogatory had been prepared or submitted by defendant or his attorney. A jury should always be advised that instructions and interrogatories come from the Court, not from counsel."

Plaintiff replies to this contention by pointing out that "counsel for defendant interposed no objection to either the reference to 'defendant's interrogatory' or to any of plaintiff's counsel's argument with regard thereto." Asserting that timely objections should have been made,

239

otherwise the point is waived, plaintiff cites Cook County v. Colonial Oil Corp., 15 Ill2d 67, 153 NE2d 844 (1958), where it is said (p 75) :

"We have consistently held that experienced counsel cannot take a chance of failing to make objections and then, upon receiving what they consider an adverse jury verdict, claim error."

Defendant cites Belfield v. Coop, 8 Ill2d 293, 134 NE2d 249 (1956), and People v. Morgan, 20 Ill2d 437, 170 NE2d 529 (1960), to show that if prejudicial arguments are made without objection of counsel or interference of the trial court, a reviewing court may consider such assignment of error "where the argument is so seriously prejudicial as to prevent the defendant from receiving a fair trial."

Plaintiff's reference as to the source of the special interrogatory was improper, and we assume that had objection been timely made, the trial court would have taken proper steps to offset the impropriety. As this record shows that defendant received a fair trial, we do not consider the improper argument of plaintiff's counsel, in the absence of objection timely made, to be "so seriously prejudicial as to prevent the defendant from receiving a fair trial."

■■■ Defendant complains that the trial court improperly refused to instruct the jury regarding the effect of a former statement inconsistent with present testimony as bearing upon the credibility of a witness. The refused instruction was IPI 3.01, in which it is said:

"The credibility of a witness may be attacked by introducing evidence that on some former occasion he made a statement or acted in a manner inconsistent with his testimony in this case on a matter material to the issues. . . ."

In support of this point, defendant cites five instances where plaintiff's trial testimony and deposition testimony

were not parallel. As previously noted, plaintiff's testimony did contain variations which the trial court ruled were not impeaching. As we found no abuse of discretion in the court's ruling, we do not consider that it was improper to refuse the instant instruction. Instructions given included IPI 2.01 on "Credibility of Witnesses." This was sufficient here.

Finally, defendant argues that the amount of damages awarded the plaintiff are grossly excessive. The evidence shows that when plaintiff was 11 years of age, part of her left kneecap was removed. By the time she was 23 years old, she began having difficulty with her left leg. On December 2, 1957, a patellectomy was performed, a procedure whereby the patella (kneecap) is removed. Plaintiff was discharged from the hospital on December 18, 1957, and rehospitalized December 29, 1957. When she was discharged from the hospital on January 17, 1958, she had a limitation of motion in the left leg.

Plaintiff's orthopedic surgeon, Dr. Robert D. Keagy, testified that plaintiff had not completely recovered from her operation when she fell, and that she was in the middle of her recovery period. When plaintiff was admitted to the hospital on February 27, 1958, the diagnosis was that she had a partial tear of the quadriceps muscle in the left leg. She was discharged on March 12, 1958, and readmitted on March 29, 1958. On March 30, 1958, she gave a history of a fall sustained on March 29, 1958. On April 1, 1958, plaintiff was operated on, and "a very extensive, essential complete tear" of the muscle was found. It was the opinion of Dr. Keagy that "if this quadriceps mechanism was torn significantly in this fall [February 27, 1958], it might very well cause a handicap with one continuous complete tear on some later day, but I would attribute it to the injury that started the tear process. . . . Like many tears they are fine as long as they are intact. If one piece, but one of these are tearing, it continues to tear with or without a fall.

241

. . . whether the second fall caused the first tearing, I don't really know. It could have."

Dr. Keagy further testified that plaintiff was discharged from the hospital on May 9, 1958. On January 9, 1959, she told him that she had fallen in her home in October 1958. On October 9, 1959, her complaints with respect to her left leg were very similar to those she complained of prior to December 2, 1957. On August 31, 1962, plaintiff told Dr. Keagy she had fallen August 30, 1962. She had doubled her left leg under her, and she came to the emergency room because she had severe pain in the knee and thigh and calf going into her great toe. On May 20, 1963, Dr. Keagy examined the plaintiff and found that she had ability to flex her left leg 120 degrees out of a possible 135 degrees, or a loss of 15 degrees. He found that her right thigh was one inch larger than the left, and her left calf was slightly smaller than her right. He found that her walk was normal. Dr. Keagy testified that 50% of all of plaintiff's difficulty with her left leg was due to her problem with her patella, and 50% of her difficulty was due to all that happened to her after the patellectomy. In 1963, he found that she had some bursitis in the left knee.

The evidence as to plaintiff's total medical expenses shows $1,547 as a result of the February 27, 1958, fall: $250 of this represents Dr. Keagy's bill, $383.90 represents the hospitalization immediately following the February 27, 1958, fall, and $914 represents the hospitalization for the fall on March 29, 1958. Plaintiff returned to work on June 1, 1958, and her total wage loss for three months was approximately $700.

As to her condition at time of trial, plaintiff testified, "I have just encountered going down the stairs in the past year and a half. I couldn't do it prior to that. It had to be one at a time. . . . I think I walk very good. I try to. I still get pains in my leg, mostly up on the thigh and around the calf part of the leg. The type of

242

pain is a cramp, a tightening up. I have lost one or two days from work every few months or so. As to whether it is getting any better, I can't answer that honestly because sometimes I feel that it is just starting to perk up and then all of a sudden I start getting the pain again. I have scars as a result of the surgery. I had an original scar from the first surgery. When I went back after the fall he had to reopen it up again, make the incision longer and also cut me along the side here for the tendons and muscle grafting."

 In considering the question of damages, "each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury in making its determination and to the ruling of the trial judge on the post-trial motions." (Lau v. West Towns Bus Co., 16 Ill2d 442, 158 NE2d 63 (1959).) The jury's determination as to damages will not be set aside unless it is the result of passion and prejudice, "or is so large as to shock the judicial conscience." (O'Keefe v. Lithocolor Press, Inc., 49 Ill App2d 123, 137, 199 NE2d 60 (1964).) Although the amount of the judgment appears to be high when compared with plaintiff's monetary expenditures, this record does not indicate that the award resulted from passion or prejudice. The evidence shows repeated hospitalization of plaintiff, and pain and discomfort over a period of years prior to trial, and in Dr. Keagy's opinion, "50 per cent of her present disfunction is attributable to the second major procedure." The award is not clearly excessive, and we find nothing in this record to warrant our disturbing it.

For the reasons given, the judgment for plaintiff is affirmed.

Affirmed.

BURMAN, P. J. and KLUCZYNSKI, J., concur.