Henry A. Graf and Alvin Green, Plaintiffs-Appellees, v. Ford Motor Company, a Foreign Corporation, Defendant-Appellant.

Gen. No. 52,534.

First District, First Division.

November 25, 1968.

Vogel & Vogel, of Chicago (L. H. Vogel and Conrad F. Floeter, of counsel), for appellant.

Norman Peters, Joseph M. Fasano, and John G. Phillips, of Chicago (Sidney Z. Karasik, of counsel), for appellees.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action in which defendant, Ford Motor Company, appeals from judgments entered on jury verdicts in favor of plaintiffs (Graf, $2,500, and Green, $15,000), who were injured while passengers in an automobile driven by defendant's agent. The basic issue is whether there was sufficient evidence to support the verdicts.

On appeal, defendant's theory is: 1. The sole proximate cause of plaintiffs' alleged injuries was the sudden and unexpected conduct of a third party, and no act or omission of defendant's agent causally contributed to the accident. 2. The trial court erred in denying defendant's motion for directed verdict and its motion for judgment notwithstanding the verdict, as: (a) No act or omission of defendant was the proximate cause of the alleged injuries of the plaintiffs. (b) The evidence established without contradiction that defendant was not guilty of any act or omission or negligent failure to act charged against it by the plaintiffs. (c) The doctrine of "last clear chance" did not apply to this case or these facts. 3. That, in any event, the trial court erred in denying defendant's motion for a new trial because the verdict of the jury was contrary to the manifest weight of the evidence.

On March 19, 1960, at about 8:30 a. m., plaintiffs, Henry A. Graf and Alvin Green, were passengers in a Ford station wagon driven by defendant's employee, James Bruns. They were proceeding northbound on highway 77, about seven miles south of Marietta, Oklahoma, when a southbound vehicle came across the highway into the northbound lane and struck the left side of the Ford "broadside." The scene of the occurrence was just north of a railroad trestle under which the highway passed in an "S" curve fashion. The vehicle in which plaintiffs were passengers was part of a cavalcade show, and it was the lead car. The highway was of cement, with one lane for northbound vehicles and one lane for southbound vehicles. The width of the paved portion of the highway was 24 feet. Adjacent to each driving lane was a gravel shoulder about seven or eight feet wide. The posted speed limit was 35 m. p. h., with a warning to slow down for the "S" curve.

The oncoming southbound vehicle was sighted as the Ford station wagon came from underneath the railroad trestle. The oncoming vehicle, a Pontiac driven by Julia

Stevens, was first sighted by plaintiff Graf 700 to 800 feet away and by plaintiff Green 900 to 1,000 feet away, and by the defendant driver, James Bruns, 300 to 400 feet away. The speed of the oncoming southbound Pontiac was estimated at 40 to 45 miles an hour by plaintiff Green, at 60 to 65 miles an hour by Howard Bernard, a passenger in the Pontiac, at 70 miles an hour by defendant driver, James Bruns, and at 70 miles an hour by the investigating police officer.

The speed of defendant's northbound Ford was variously estimated at 60 to 65 miles an hour by plaintiff Green, at 30 miles an hour by the defendant driver, Bruns, and at 50 miles an hour by the investigating police officer.

The oncoming southbound car was first observed going off the road and on to its own right-hand shoulder four or five times, with the estimated distance of 200 to 300 feet by plaintiff Graf and 150 to 200 feet as stated by plaintiff Green.

The next observed action of the oncoming car was that it slid "broadside" for a distance estimated at 100 to 150 feet by plaintiff Graf and 150 to 200 feet by plaintiff Green. While skidding sideways, the Pontiac struck a guard rail post located 10 feet off the road on its own (west) shoulder, at a time when the distance between the approaching vehicles was between 250 and 300 feet according to plaintiff Green and by plaintiff Graf to be 90 to 100 feet. The Pontiac bounced off the guard rail and came across the highway at a 45° angle, so that the front of the oncoming Pontiac struck the left side of the Ford "broadside." The distance from the post to the point of collision was estimated by plaintiff Green to be 15 to 20 feet, and the Pontiac was traveling about 45 miles per hour.

The investigating police officer measured 178 feet of tire marks from the southbound Pontiac from the point of the sheared off guard rail post, traveling along the

shoulder and turning to the left abruptly at a diagonal across the road. The distance from where these tire marks came back on the paved portion of the highway at the point of impact was 16 feet.

Plaintiff Alvin Green testified that he was sitting in the front seat next to the driver and looking out the front window. As they passed the railroad trestle, "I said to the driver, 'Look at that car. It is weaving.' And he said, 'I see it.'" At that time they were about "three blocks, three and a half blocks" or "900 to a thousand feet" from the other car. A few minutes before the occurrence, he had looked at the speedometer and they were going about 60 to 65 miles per hour, and the driver maintained it. He also noticed that just before the railroad trestle there was a posted speed sign, and "it said thirty-five, or slow down to thirty-five or forty miles an hour." The oncoming car "hit the guard rail and bounced off the guard rail, I would say about a forty-five degree angle, and hit us broadside on our left side." It was "eight to ten seconds" from the time he first saw the oncoming car until the time of the impact, and at that time the speed of the car in which he was riding was "about sixty to sixty-five," and they were in the paved portion of "our side of the lane." Their car rolled "about 150, 200 feet, and then back on its wheels again . . . a complete cycle over." On cross-examination, Green said that the oncoming car must have been going 45 to 50 miles an hour.

The driver, James Bruns, testified that as they approached the area of occurrence, there was a 40 miles per hour sign, and as they approached the sign his speed had been "around fifty or fifty-five miles per hour. When I arrived at the sign I slowed up. The curve took you under the railroad track. . . . As I was going into the final portion of the S curve I noticed this Pontiac coming around the curve from the north about 300 to 400 feet away. When I first saw the car, it was traveling at a high rate of speed, having difficulty in negotiating the

394

curve, and the car gradually went off the road on the opposite side of the highway from me, traveled down the shoulder of the road and as it traveled it tended to go into a side skid; eventually the car hit a guard post alongside the road. At that point the car veered off the guard post—to sort of ricochet off the guard post, and came across the highway then directly toward me. It came directly into the side of our car; . . . . A couple of seconds elapsed from the time this Pontiac struck the post until the collision with my car occurred. Prior to the collision I had slowed down somewhat, by taking my foot off the gas. Also I had moved over in the highway to my right. From the time I first saw the southbound Pontiac until the time of the collision I was never over on the left side of the center of that highway. I was never over the center line. At the point of the impact I was close to having my right hand wheels off the main highway." On cross-examination, he said, "When I saw this Pontiac go off the highway I took my foot off the gas. I would estimate my speed around thirty miles an hour. From the time I first saw this Pontiac until the time of the collision was around three to five seconds. . . . I estimated the speed of the Pontiac at seventy miles an hour prior to the accident."

Defendant argues that there was an absence of any evidence, together with all reasonable inferences taken therefrom, tending to support the material allegations of plaintiffs' complaint, and therefore it was the duty of the trial court to grant defendant's motion for a directed verdict. Defendant's citations include Oklahoma Natural Gas Co. v. McKee, 121 F2d 583 (1941); Malone v. Chicago Transit Authority, 76 Ill App2d 451, 222 NE2d 93 (1966); and Sjostrom v. Sproule, 34 Ill App2d 338, 181 NE2d 379 (1962).

Defendant relies principally on Malone v. Chicago Transit Authority, where a car made a sudden turn in

front of defendant's bus, in which plaintiff was riding as a passenger. There this court said (p 454):

> "There is no testimony from which it can be reasonably inferred that the driver failed to exercise due care. 'The mere fact that an accident resulting in an injury to a person or in damage to property has occurred does not authorize a presumption or inference that the defendant was negligent.'"

Defendant asserts, "The basic question is whether the conduct of defendant's driver constituted negligence which was a proximate cause of plaintiffs' alleged injuries. The doctrine of 'last clear chance' is not applicable to this case for these facts. The law of Oklahoma has not been pleaded. This doctrine, the tenets of which were disguisedly urged by plaintiffs' attorney, does not create a greater duty upon a defendant to exercise more than ordinary care commensurate with the sudden circumstances arising in no way from his own conduct. Plaintiffs' attorney has urged—erroneously we submit—that the defendant had a *duty* to avoid this accident and this duty arose because defendant had time and opportunity to avert known danger. We submit that even the evidence most favorable to the plaintiffs does not support this contention."

Defendant reasons from the evidence on distance and speed that "simple mathematics" show "defendant had a mere two seconds to determine with reasonable diligence whether to alter the speed or direction of his own vehicle." Defendant cites as in point Sjostrom v. Sproule, supra, where the court said (p 345):

> "The evidence shows that Scott (defendant), as well as plaintiff, was helpless in the situation, and had no opportunity to escape. Counsel for plaintiff argues that Scott never tried to avoid the accident, never pulled off the road to the gravel shoulder, but the

occurrence happened so suddenly he obviously had no time to do so. Certainly the accident was not caused by any negligence on the part of Scott, and accordingly we are convinced that the court should have so held as a matter of law."

Plaintiffs contend that the evidence discloses that defendant's driver had ample time (eight to ten seconds) and distance (900 to 1,000 feet) to attempt avoidance of the collision, and the jury properly found him negligent as a matter of fact. Plaintiffs argue that the driver's conduct and omissions were not consistent with the conduct of a reasonably prudent driver in the circumstances.

The determinative issue here is whether there was sufficient evidence to support the verdicts. If that question is determined affirmatively, then defendant's motions for a directed verdict and a judgment n. o. v. were without substance.

In our view, the evidence here should be examined in the light of sudden emergency pronouncements. In 65 CJS, Negligence, § 17, it is said (p 603) :

"Where one is confronted with a sudden emergency, or with imminent or sudden peril, without sufficient time to determine with certainty the best course to pursue, he is not held to the same accuracy of judgment, or the same degree of care, as would be required of him if he had time for deliberation or reflection. He is required to exercise such care, or choice of conduct, as an ordinarily or reasonably prudent man would exercise when confronted by a like emergency, and if he does so he is not liable for an injury which has resulted from his conduct; and this is true even though another course of conduct would have been more judicious, . . . ."

See, also, 4 ILP, § 108, Acts in Emergencies, where it is said (p 311) :

"Thus a driver of a motor vehicle is bound to use care and caution to avoid a collision with an automobile which skids into his lane of travel.

"Where the motorist himself created, or contributed to the creation of, the emergency by his own negligent or reckless conduct, he cannot escape liability on the ground that he was forced to act in an emergency."

In Dirksmeyer v. Barnes, 2 Ill App2d 496, 119 NE2d 813 (1954), it is said (p 506) :

"The existence of a sudden emergency or imminent peril does not excuse the driver of the vehicle from using that degree of care and caution which an ordinary prudent and careful person would have exercised under the like facts, circumstances and emergency, and whether such degree of care and caution was so exercised was for the jury to determine."

In Rzeszewski v. Barth, 324 Ill App 345, 58 NE2d 269 (1944), this test was stated by the court (p 354) :

"Persons who have to act in a sudden emergency are not to be judged in the light of after events, but are to be judged, under all the circumstances of the case, by the standard of what a prudent person would have been likely to do under similar circumstances. . . . Where a person must act in an emergency it is for the jury to say whether he acted with that care and foresight which a reasonably careful and prudent driver would use in like circumstances."

In this record, there is conflicting evidence as to when the oncoming Pontiac was first sighted, the distance it traveled in a "weaving" fashion, the distance of the sideways slide, and the lapse of time from when the Pontiac was first seen until the impact. There was also a conflict

398

as to the speed of defendant's automobile, and whether driver Bruns took any action to avoid the collision. However, it is undisputed that on the approach to the "S" curve there was a warning sign, seen by Bruns, for northbound traffic to slow down to 40 m. p. h. Plaintiff Green was positive and unshaken in his testimony that the Ford's speed was 60 to 65 m. p. h. approaching the "S" curve, and this speed was maintained until the impact, and that Bruns took no action which might have avoided the collision.

■ ■ After considering all the testimony, together with the reasonable inferences legitimately arising therefrom and viewed in its aspect most favorable to plaintiffs, we are not persuaded, as a matter of law, that there has been a total failure of proof of negligence on the part of the defendant's driver. We believe fair-minded men might differ as to whether Bruns, by not reducing his speed or by not attempting to pull over to the shoulder of the road adjacent to his lane, after sighting potential trouble ahead, failed to exercise that care which an ordinarily prudent person would have exercised when confronted with a like emergency. Questions which are composed of factors sufficient to cause reasonable men to arrive at different results should not be determined as matters of law. Whether Bruns exercised that care which was proportionate to the danger known to him at that time was a question for the jury. Sommese v. Maling Bros., Inc., 65 Ill App2d 223, 236, 213 NE2d 153 (1965).

■ We conclude there was sufficient substantial evidence to support the verdicts. Therefore, the trial court properly denied defendant's motions for a directed verdict or a judgment n. o. v.

■ Under the law, we cannot disturb the verdict of a jury unless it is clearly against the manifest weight of the evidence. Manifest means clearly evident, plain, indisputable. We do not consider this to be a case in which an opposite conclusion is clearly evident. We find no

merit in this contention. 65 Ill App2d 223, 238, 213 NE 2d 153 (1965).

For the reasons given, the judgments of the Circuit Court of Cook County are affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.