Mrs. Hazel **BONNER**, wife of/and James N. Bonner, Plaintiffs

v.

**UNITED STATES** of America, Defendant.

Civ. A. No. 70–444.

United States District Court, E. D. Louisiana, New Orleans Division.

Jan. 5, 1972.

James S. Quinlivan, Jr., Quinlivan & Clay, New Orleans, for plaintiffs.

James Carriere, John Schupp, Asst. U. S. Attys., New Orleans, La., for the U. S.

CASSIBRY, District Judge:

This is a suit by plaintiffs Mrs. Hazel Bonner and her husband James N. Bonner against the United States for damages resulting to them from the alleged negligent operation of an Air Force vehicle by Eugene Brown, a member of the United States Air Force. The Court has jurisdiction under the Federal Tort Claims Act, 28 United States Code, sec. 1346 et seq.

Plaintiff Hazel Bonner suffered a severe whiplash type injury on April 3, 1967 on McGuire Air Force Base, New Jersey, when a 1966 Chevrolet truck operated by Eugene Brown struck the rear of the Bonner vehicle, a 1967 Ford Galaxie, being operated by Mrs. Mary H. Bartholomew, a daughter of the plaintiffs, and in which Hazel Bonner was the only passenger. Mr. and Mrs. Bonner made administrative claims on March 25, 1969 in the amounts of $20,000.00 and $60,000.00 respectively. These claims were approved in the amount of $15,000.00 on February 17, 1970. Plaintiffs filed this suit on February 26, 1970 seeking damages in the increased amounts of $300,000.00 for Mrs. Bonner

and $100,000.00 for Mr. Bonner, allegedly based upon newly discovered evidence not reasonably discoverable at the time of the administrative claim. On the day of trial the plaintiffs submitted a motion to amend the complaint to increase the damage demand to $1,000,000.00 and $500,000.00 on the basis of evidence newly discovered since the filing of the administrative claim and the original complaint and intervening facts relating to the amount of the claim. The defendants submitted a motion to reduce the ad damnum of the complaint to the amounts demanded in the administrative claims. Both of these motions were taken under advisement to be decided along with the merits of the case.

The uncontroverted versions of the accident by Mary Bartholomew and Hazel Bonner establish that the negligence of the driver of the defendant's vehicle was the cause of the accident. According to them the Bonner vehicle was stopped at an intersection on McGuire Air Force Base to make a left turn, and while waiting for the oncoming traffic to clear with the left-turn indicator signalling a left turn, the Bonner automobile was struck from the rear by the Air Force truck. The driver hit his hands on the steering wheel as if he were disgusted with himself and got out of the truck saying, "I just wasn't watching where I was going." It is conceded by the defendant that the driver of its vehicle was acting in the course of his duties at the time of the accident.

The defendant has two principal defenses to the plaintiffs' large claims for damages: First, there is no causal connection between the accident and the plaintiff Hazel Bonner's present total and permanent disability; and Second, if there was such a causal connection,

no newly discovered evidence exists, not reasonably discoverable at the time of the administrative claims on March 25, 1969, and there are no intervening facts to justify allowing damages for a greater amount than those claimed in the administrative claims.[1]

Hazel Bonner is 51 years old. Until this accident she had functioned normally without any unusual or prolonged health problems, had raised four children and at the same time had worked as a seamstress for 24 years. She now has numerous complaints. She suffers pain all through her neck and shoulder area, has numbness in areas of her back and in her arms, has numerous and prolonged headaches, and episodes of difficulty in hearing. She is unable to focus her eyes or to keep them open, and they are sensitive to light and tear all the time. She has marked instability in her gait. She is totally disabled from performing her job as a seamstress or performing her housework. She attends to her personal needs, such as bathing and dressing herself, poorly and with difficulty.

Her appearance is of a much older, a pathetic and grotesque, individual. Her head has the appearance of being pulled down and to one side. She has a bizarre grimace, a twitching of the head and face, blinking of the eyes, and gives the impression of being forced to hold her eyes shut in a tight squint. She cannot walk unassisted.

The history of the development of her symptoms was difficult to obtain. She impressed the Court as a sincere person completely willing to cooperate, but apparently the discussion of her complaints and the time of their onset is no easy matter for her.[2] She testified in a well

1. 28 U.S.C. § 2675(b) provides:
"* * * Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the fed-

eral agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."

2. Two of her physicians commented on the same difficulty. Dr. John Atkinson said, "It was very difficult to get all the history out of her." Dr. Malcolm Louis Latour

modulated, controlled voice. She was lucid, coherent and spoke with composure. It was difficult to relate her manner of testifying to her appearance. It gave an impression of normality in contrast to her grossly unnatural appearance. The Court interrupted her examination at the trial to get her to be definite about time when she was discussing her complaints, and she was obviously trying to help the Court to the best of her ability. From the testimony of Mrs. Bonner, the members of her family, and the doctors who have examined and treated her since the accident, the following history of symptoms and medical treatment is revealed.

The Air Force vehicle hit the Bonner automobile with forceful impact. Mrs. Bonner was thrown forward against the front of the car striking her chest area, and then backward and down against the seat. She related to one doctor that the impact was so great that the seat was torn loose. The car was damaged so extensively that it could not be driven back to New Orleans. Mr. and Mrs. Bonner returned by plane from their visit to their daughter and son-in-law who was in the service. Mr. Bonner returned for the automobile some six weeks later. The repair bill amounted to $983.00.

Air Force personnel took her to the government hospital where X-rays were made which revealed no fractures and she was advised to return home to see her own doctor as soon as possible. She related that the pain was so intense immediately after the accident in her neck and shoulder area that she could hardly sit still.

She consulted Dr. Leon McIntire on April 7, 1967, three days after the accident. He had X-rays made at West Jefferson General Hospital, Jefferson Parish, Louisiana, of her right hip and her entire vertebral column. The radiologist read them and reported no fractures. Some arthritis was noted but the impression was that her vertebra presented a

normal study for a person of her age. On his first examination he noted that she was nervous and found that she had a slight ear infection in the right ear which he considered to have no connection with the accident. She had cervical spasm and tenderness in the cervical area and some tenderness down the muscles along the spine from the cervical region to the lumbar area. He diagnosed her as having cervical sprain and dorsal and lumbar-sacral strains. He treated her until August 28, 1967 with pain relievers, muscle relaxants and physiotherapy to her cervical and dorsal spine area. She did not improve. When he last saw her he could not find any muscle spasm, but she continued to have pain from the cervical to the lumbar spine with back and neck movement. She had headaches and forward bending was restricted. He referred her to an orthopedist.

While Dr. McIntire treated her she was nervous, anxious and tense and he prescribed medication for her nervousness, but he did not regard her nervousness as a great problem. He did not consider that she was permanently disabled. He had no knowledge of any complaints with her eyesight while he was treating her. He examined her eyes for hemorrhage and did not recall that she had any irritation.

Mrs. Bonner recalls that her right eye was bloodshot the day she got back to New Orleans, but she thought she probably had a cold in it and "it just finally went away." Her testimony does not reveal that she mentioned this to Dr. McIntire. During this time the pain in her back and shoulder and the numbness in her legs prevented her from being able to care for herself and do her housework. A friend of her family was hired to live in and help with the work. She described her difficulty in walking when she was seeing Dr. McIntire as a numbness that made her "feel funny like she couldn't really move her legs but had to push them along." According to her she started having trouble with her

related that "The actual history of her illness was difficult for her to describe in terms of logical series of symptom development and formation."

ears—they "felt funny"—and she "couldn't hear too good" a few months after the accident. She went to a doctor she identified as Dr. Zoller for this trouble. During the time that she was being treated by Dr. McIntire she began noticing reduced vision,—seeing telephone numbers became difficult for her.

Dr. Joseph J. Frensilli, an orthopedic surgeon, saw her first on August 4, 1967. She complained to him of some blurring of vision since the accident but told him that it had completely cleared. She complained also of some decreased hearing in both ears and told him that she was under treatment for that by her personal ear, nose and throat physician. His testimony does not reveal that he attached any significance to these complaints as having any relation to his field of specialty.

His X-ray examination of the cervical and thoracic spine showed some arthritis, but the cervical spine was considered within normal limits. She complained of pain which increased on exertion and was relieved by rest. His physical examination showed some tenderness and a questionable spasm of both paravertebral muscles. He had her admitted to the West Jefferson General Hospital on August 30, 1967 and placed her in cervical traction which diminished the pain considerably. She was discharged on September 3, 1967 and sent home on intermittent cervical traction at home. She was checked at regular intervals at the hospital until October 4 and found to be further improving with the intermittent cervical traction. When he last saw her on October 4, 1967 she complained of pain and tenderness over the mid-dorsal spine below the neck for which he gave her an injection in that area of hydrocortisone and a local anesthetic which gave her immediate relief. She was to return to his office in a week but failed to do so.

Mrs. Bonner associates the time that her eyes became red and her vision got so bad that the could not even watch TV with the time of her treatment by Dr. Frensilli. She recalls that after she saw Dr. Frensilli she went to an optometrist, a Dr. Reynolds, and he found that all she needed was glasses. After she got glasses she remembers that her eyes got a "little bit better" and then they got worse and then she "went to Dr. Atkinson." She did not consult Dr. John W. Atkinson until January 27, 1969 so that her condition during the fifteen months between the last visit to Dr. Frensilli and that time must be ascertained mainly from her testimony and that of her family.

Norman Bartholomew, Mary's husband, was discharged from the service in January 1968 and they came back to New Orleans and moved in with the Bonners at the latter's suggestion because the Bartholomews did not have a place to live. They lived with the Bonners for a year.

Mary testified that her mother was very nervous all the time during the year that she lived there and complained of irritation of her eyes. Her eyes were red and she was always rubbing them as if she had something in them like dust. During this time her mother was able to do some of the housework, had no trouble walking and as far as she remembers had no ear trouble. The head shaking, eye blinking, and the trouble Mrs. Bonner now has keeping her eyes open were not present in 1968. She could not be sure when the inability to keep the eyes open developed. Mr. Bonner is a truck driver and his employment requires him to be away from home much of the time. He was aware that her painful symptoms continued and that she still was suffering from pain in her chest, severe headaches and numbness in the left side of her body, her legs and her arms when she went to see Dr. Atkinson in January 1969. He did not notice that she was very nervous and he attributes this to the fact that he was away from home much of the time. He first noticed the difficulty she had with her eyes in November or December 1968. She "started having this redness of her eyes and she couldn't watch television long without it going into a blur." She went to Dr. Reynolds the optometrist then.

The chronology of her efforts to get relief for her eye problems from the optometrist and an eye specialist whom she identified as Dr. Pierce is wholly unclear. She did state positively that she saw the eye specialist twice and he could find no tumors or other defect of her eyes. Dr. Atkinson testified that she stated to him that Dr. Reynolds suggested she consult him after she had been to Dr. Reynolds to get new glasses which helped some but did not clear up her eye problems completely. Mr. and Mr. Bonner's testimony and that of Dr. Atkinson show fairly conclusively that she saw the optometrist and possibly the eye specialist also toward the end of 1968 or the beginning of 1969.

A report of Dr. Max E. Johnson, who made a neurological examination, to plaintiffs' attorney on June 20, 1969 confirms that her eye trouble increased toward the end of 1968. When he examined her on June 11, 1969 she had numerous complaints including the pain in her neck and back, but principally she complained about her eyes which, according to her, had been turning red and blinking since November 1968 so that she could hardly walk. She also told him that she was having trouble with her ears about the same time and tubes were put in her ears so that she could hear, and that she stopped driving her car in December 1968.

The specialists who treated her for her eye and ear trouble were not called to testify at the trial, and the inference is that they found no organic defects to relate to her complaints. Apparently Mrs. Bonner went to ear and eye specialists for specific treatment for her ear and eye complaints, and the other physicians that she related these problems to did not consider them as particularly significant in connection with their treatment of her cervical injury.

Dr. John W. Atkinson, a general practitioner whom she consulted in January 1969 at the suggestion of the optometrist Dr. Reynolds, had received special training in the diagnosing and treatment of nervous and emotional disorders. She told him that she was going to Dr. Zoller for a hearing difficulty and she had numerous complaints of pain in the neck, shoulders and back, severe nervousness, headaches, and blinking of the eyes. At this first visit she was grimacing and appeared to be in severe pain. He found her blood pressure to be elevated. He prescribed drugs for the blood pressure, for pain and for nervousness. On her next visit in February she still complained of nervousness and blinking of the eyelids, but told him it was worse some days than others.

In the beginning he regarded her problem as ninety percent physical and ten percent emotional. He did not regard her as permanently disabled, and he was optimistic about her complete recovery. He continued to give her drugs for nervousness, tension, muscle spasm and pain. It was his purpose, he said, to give her supportive treatment to encourage her to get well, but the most that he could say for his treatment was that it retarded her deterioration. The deterioration was gradual at first, but her symptoms never abated and in April she was still going to Dr. Zoller for her ears, and her eye trouble was worsening. In June 1969 the backache, headaches, numbness in the extremities, episodes of pain in both ears, and eye blinking had worsened considerably and by July 23 he made the decision that her problem was more psychological than physical—that she had a severe disabling neurosis—but he still does not believe that all of her problem is psychological. In his opinion she had a strained cervical region and had had sufficient head trauma to cause the headaches, and the automobile accident precipitated her condition directly or indirectly.

He has continued to treat her symptoms, but when he realized that his best efforts were not preventing further deterioration and her condition was pathetic, he advised her to go wherever she could for relief—to ear, nose, throat and other specialists. He wrote to the plaintiffs' attorney in September 1969 advising him that in his opinion Mrs. Bon-

ner had a severe disabling neurosis. After treating her six months he concluded that she was permanently disabled and a few days before trial he considered that she is still deteriorating.

Mr. Bonner testified that Dr. Atkinson called him in about six months after she started receiving treatment and told him that he believed that Mrs. Bonner was in need of psychiatric treatment. Mr. Bonner had realized that his wife was growing progressively worse while she was being treated by Dr. Atkinson. Her eye trouble, especially the eye twitching, was becoming noticeably worse, and she was having trouble getting around the house—stumbling over furniture—and having trouble dressing herself. The psychiatric treatment was never obtained for her, but she was examined for neurological changes by Dr. Max Johnson on June 11, 1969. His report of that examination was introduced into evidence.

After relating her history and her symptoms he noted that she had frequent blinking spasm of the eyes and walked with her head down and her eyes "partially or completely closed, unsteadily, holding to furniture." Her principal complaint to him was that, since November 1968, her eyes had been turning red and blinking so that she could hardly keep them open to walk. Her hearing was good the day he saw her. She could hear a wrist watch at each ear. His impression of the patient was:

" * * * I would feel that she has had a cervical as well as lower back strain reaction to the injury described. I do not see any neurological changes that could be ascribed to this accident or to its after effects. I'm uncertain as to the nature of her complaints since Nov. 1968 involving the spasm and blinking of the eyes. I do not feel that there is enough information to make a definite diagnosis. This could either be a nervous tension condition or possibly due to some mid-brain changes perhaps related to vascular disorder and hypertension."

When Mr. Bonner realized that his wife could no longer get around by herself without running into the furniture and walls, he arranged for his daughter Patricia and her husband to come to live with them and care for Mrs. Bonner. Patricia moved in with them in June or July 1969 and stayed until August 1970 when Mary Bartholomew and her family moved back and Mary was still living with the Bonners at the time of trial.

Mrs. Bonner was evaluated for five days from December 8 through December 12, 1969 at the United States Air Force Medical Center at Keesler Air Force Base, Mississippi. The narrative summary of her clinical record prepared by Dr. Sheldon B. Staunton and the consultation report of Dr. David Sheinkin, the psychiatrist who examined her, were introduced in evidence by the United States. No physical basis was found for her totally disabled condition. The orthopedist who examined her found no manifestation of spinal injury, and he was unable to explain on any organic basis all of her complaints of pain. X-rays did show some degenerative arthritis of the spine which was regarded as a physical basis for some of her pain. Dr. Staunton, a specialist in neurology, could find no specific neurological disease and no evidence of serious or permanent brain, spinal cord or peripheral nerve damage. The ophthalmologist who examined her found her vision to be normal and no evidence of ocular disease.

Dr. Sheinkin, the psychiatrist, after seeing her for two periods of more than an hour on the 11th and 12th, concluded that her difficulty was primarily a psychiatric one and was probably a conversion reaction. According to his report she wore dark glasses and had difficulty keeping her eyes open. Facial tics of her eyes, mouth and cheeks and jerking and twitching of her head presented to him the picture of a pathetic, grotesque individual. He found that she related well, and she spoke to him in a conversational tone logically and coherently. He noted the "marked contrast between the conversational, matter of fact, and at time jolly talk of this woman and the appearance of this bent over twitching

woman (had only the audio part of the interview been available, it would not have been possible to imagine the grotesqueness of this woman's appearance)."

When he made his report at the end of these interviews he felt "that the auto accident did not, in and of itself, cause any of the psychiatric difficulties * *. The auto accident, coming at the time in her life when it did, might have set in motion [or precipitated] a series of events which because of her own existing personality structure and past [history] led to the overt psychiatric illness." Dr. Staunton expressed these feelings of Dr. Sheinkin's in the narrative summary thus: " * * * her emotional problem was the main disabling factor to her, and * * * at least a part of the emotional problem must be attributed to the accident."

Dr. Sheinkin testified for the United States at the trial and at that time he had altered his opinion. He did not believe that the automobile accident precipitated the emotional difficulty of Mrs. Bonner. He was still of the opinion that Mrs. Bonner was definitely suffering with an emotional illness and he considered that it was a conversion reaction. He said conversion reaction essentially means that a person converts an emotional problem to a physical one and so intense is the experience with the emotional problem that the person experiences serious physical difficulty. He pointed out that it had been pertinent to his evaluation of the patient that he had seen her on consultation with records available to him of a series of examinations indicating that, although Mrs. Bonner had been seen by a series of specialists in various medical fields, no organic deficits were found.

Although Dr. Sheinkin tried to make clear his reason for changing his opinion that the accident could have precipitated the emotional illness, his explanation was somewhat difficult to follow and questioning by the Court for purposes of clarification was not wholly successful. His reasoning appeared to be

that Mrs. Bonner had a conversion reaction and not a traumatic neurosis, and the emotional trouble could only have been precipitated by the accident if it were a traumatic neurosis. He explained that a conversion reaction is a converting of anxiety into a physical symptom, and that it could occur in a neurotic, a schizophrenic or a psychotic patient, whereas a traumatic neurosis is precipitated by a traumatic event.

According to him, Mrs. Bonner's illness was not a traumatic neurosis because

1. The automobile accident was not the overwhelming type accident that precipitates traumatic neurosis;
2. Mrs. Bonner had no nightmares or obsessions with the accident; and
3. There was a time lag of a year between the accident and the onset of symptoms of her emotional illness.

He gave as examples of the overwhelming type of accident or event that precipitates traumatic neurosis the tremendous pressures of war and a major casualty such as a train wreck or airplane crash. In a traumatic neurosis the person is so overwhelmed by the event that she has recurring nightmares of the accident, and is so obsessed with it that she constantly talks about it, relating the event over and over again. He did not consider that an automobile accident such as Mrs. Bonner was involved in could overwhelm a person sufficiently to produce a traumatic neurosis, and Mrs Bonner was not obsessed with it. He recalled that she had not mentioned the accident on her own and when he asked her about it she showed no inclination to talk about it "a whole lot."

The principal reason for his altered opinion in regard to the accident causing Mrs. Bonner's emotional illness was the time lag. He explained that he did not know at the time of his examination, but only found out later, that the symptoms of emotional illness occurred a year after the accident. It was difficult for him to get from Mrs. Bonner the sequence of

the occurrence of her symptoms. He viewed the pain she has continued to suffer since the accident as separate from her emotional condition—that is, her painful symptoms of back pain, neck and shoulder pain and headaches he viewed separately from her inability to get around and the twitching of the face and eyes and head. He attached no significance to the fact that she never satisfactorily recovered from her painful symptoms in determining the cause of her emotional difficulty.

After he found out that there was a year between the accident and the onset of the symptoms of her emotional illness, he was of the opinion that anything could have happened in that year to create the anxiety which made her reach a point that she could no longer deal with it. It seemed more like rationalization to him to attribute her symptoms to the accident after such a long interval. Therapy would be required in his opinion to determine if the accident had anything at all to do with her emotional difficulty.

Dr. Malcolm Louis Latour, the psychiatrist who testified at the trial for the plaintiff, examined her on June 8 and 10, 1970 for approximately 45 minutes each time. Dr. Latour is on the staff of three hospitals in New Orleans— Touro Infirmary, Flint-Goodrich and DePaul—and he is the director of the intensive psychotherapy unit at DePaul.

He was somewhat surprised at her pathetic and grotesque appearance. She complained of irritability, excessive feelings of nervousness, backache, uncontrollable head movement and uncontrollable blinking, red eyes and trouble focusing them and walking difficulty, but her chief complaint was that she could not see well. About a year before was her recollection of the time of the onset of the redness and blinking of the eyes, but she had difficulty remembering the order and time of the development of her symptoms and he had to question her over and over again to get this information. She was almost indifferent to her other symptoms in comparison to her distress over her vision problem.

When he saw her she had begun using two fingers of one hand to keep the lids open on one eye and she had developed a technique for coping with the involuntary movements of the head by sipping water. For short periods of time after taking a sip of water the head would magically stabilize, her lids would stay open and she would be able to read or dial the telephone.

His diagnostic impression was that she had a bizarre conversion reaction with suspected underlying psychotic illness. He explained that when a patient has physical symptoms such as pain, or difficulty in seeing or hearing, and there is no neurological or physical basis for them, the patient can be said to have a conversion reaction. The patient has converted a mental difficulty—the anxiety and stress of an emotional problem—into physical symptoms. These symptoms are as real to the patient, however, as they would be if they had a physical basis.

He designated her illness as a traumatic conversion reaction. In his opinion it had been precipitated by the accident because she had been a healthy, functioning individual before the accident, but she never satisfactorily recovered from it, and had gradually developed one symptom after another that progressively worsened and ultimately totally disabled her. The symptoms of traumatic conversion reaction can develop gradually over a period of time in his opinion.

Traumatic neurosis and conversion reaction are not necessarily the same thing according to Dr. Latour. Conversion reaction may occur without trauma as the precipitating cause, and a traumatic experience may produce a neurosis that is not a conversion reaction.

Both of the psychiatrists thought there was a possibility that Mrs. Bonner's emotional make-up, or something that she may have been coping with at the time of the accident could have contributed to, or have been an underlying factor in, her illness. Dr. Sheinkin had the impression that her relationships with her children had been stressful for

her. Her son's marital problems had been particularly upsetting. She had had to quit work on two occasions to care for her son's children because of the break up of two of his marriages, and she told Dr. Sheinkin that she had hated to quit work. The son had married a third time and had taken his children shortly before the accident. Mrs. Bonner was planning to resume her employment as a seamstress when she returned from the vacation visit to the daughter in Maryland. Dr. Latour considered that, even if she had been coping with stress when the accident occurred, she may well have "breezed through life" with no difficulty had she not been in the accident.

Both psychiatrists were convinced that she was totally disabled, that her condition was chronic and that she should have a period of at least six months of intensive psychiatric therapy in a psychiatric facility away from members of her family who have given her secondary gains by their care of her since the accident. She might improve with this therapy but the chances of her complete recovery are regarded by both as slim. Dr. Latour estimated the chance of full recovery at ten percent.

Although there was no issue as between the parties that the plaintiff's disability was an emotional one, the Court, out of reluctance to write off Mrs. Bonner as a mental patient and subject her to the ordeal of intensive psychiatric therapy if there was any possibility of a physical basis for the complaints, appointed with the agreement of counsel its own

orthopedic expert to examine Mrs. Bonner.[3]

Dr. Henry LaRocca, a member of the Division of Orthopedics, Tulane University School of Medicine,[4] found no orthopedic basis for her constellation of symptoms and had the impression that her difficulty is emotional—a post-traumatic conversion reaction. A neurologist in the Tulane medical school, Dr. William A. Martin, to whom Dr. LaRocca referred Mrs. Bonner for consultation, found no neurological difficulty and agreed that her illness is psychiatric.

## CAUSATION

Plaintiff Hazel Bonner urges that her experts established beyond any possible doubt that the accident was a substantial cause of her emotional illness and resulting disability. Dr. Atkinson and Dr. Latour were both of the opinion that the accident was the precipitating cause of the emotional illness that has disabled her. Dr. Sheinkin considered at the time he examined her in December 1969 that the accident might have had something to do with her psychiatric illness, but he was of the opinion at the trial that it had no connection with her illness principally because he had learned after examining Mrs. Bonner that the onset of symptoms of her psychiatric illness had occurred a year after the accident. The United States relies on Dr. Sheinkin's opinion at the time of trial for its contention that the time intervening between the time of the accident on April 3, 1967 and the onset of the symptoms of the conver-

3. By definition of both psychiatrists a conversion reaction can be diagnosed only if no physical basis exists for the symptoms of the patient. Except for the orthopedic examination at Keesler, no orthopedist had seen Mrs. Bonner since Dr. Frensilli last saw her in 1967. The evidence did not reveal that either orthopedist had any particular expertise in cervical injuries or attached any orthopedic significance to her complaints of ear and eye difficulty. Orthopedic opinion that insidious progress of cumulative symptoms including ear and eye problems —hearing difficulty, blurring of vision and twitching and excessive tearing of the eyes —can be produced by even mild whip lash type injuries without ear and eye examination revealing any abnormality of these organs has been documented in at least one case. See Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967).

4. Upon inquiry from the Court for recommendation of an expert with peculiar knowledge and expertise in cervical injury, Dr. Jack Wickstrom, the Chairman of the Division of Orthopedics at Tulane recommended Dr. LaRocca.

sion reaction—her inability to keep her eyes open and her neck twitching—in November 1968 precludes the accident from being the cause of the conversion reaction.

I cannot agree that her eye symptoms began in November 1968. They had progressed to the point of disabling her by that time. She stopped driving an automobile in December 1968, and in June 1969 she related to Dr. Max Johnson that, since November 1968, her eyes had been red and blinking *so that she could hardly walk*. This statement can only be taken to mean that her symptoms were that severe then and not that they commenced at that time.

She recalls having some redness in her right eye when she returned to New Orleans after the accident, although Dr. McIntire did not note this in his examination. She complained to Dr. Frensilli four months after the accident of blurring of vision since the accident that had cleared up. During the time that she was being treated by Dr. Frensilli her vision became so bad that she consulted an optometrist. Glasses gave her some immediate, but no lasting relief. Her daughter Mary testified that her eyes were irritated and she was always rubbing them during 1968.

The United States asserts that there are fourteen "critical" months between October 1967 when Dr. Frensilli's treatment ended and January 1969 when Dr. Atkinson's treatment began which are medically unaccounted for. The inference sought here is that Mrs. Bonner had a period of recuperation after treatment for her cervical injury and before the onset of the symptoms of her emotional illness. The evidence permits no such inference. The doctors whom she saw in those months were not called because, obviously, they found no organic basis for her complaints. She was consulting in that period specialists whom she thought could help her best with her major complaints, eye and ear troubles. She was referred to Dr. Atkinson by the optometrist Dr. Reynolds who could find no basis for her vision complaints.

■ The Court is convinced that her eye symptoms were mild and intermittent in the beginning, but they gradually and progressively worsened until they were disabling. Dr. Sheinkin is mistaken that the onset of the symptoms occurred at the time they disabled her. Nor can the Court accept as valid Dr. Sheinkin's differentiation between her painful symptoms which have no physical basis and her vision and hearing symptoms. She has continued to have pain in her shoulders, neck and back since the accident, although there was some improvement after the cervical traction, and the arthritis she has cannot account for it. Since Mrs. Bonner was a healthy, functioning individual before the accident and she never satisfactorily recovered from it, but developed one symptom after another that progressively worsened until she became totally disabled, the Court is convinced that the accident was the precipitating cause of the emotional illness that produced her disability.

## MOTION TO REDUCE AD DAMNUM

■ The government's motion to reduce the ad damnum of this complaint as to plaintiff Hazel Bonner to $60,000, and as to plaintiff James N. Bonner to $20,000 must be denied. The plaintiffs have shown that the increased amounts of damages prayed for in this complaint over those claimed in the administrative claims are based on newly discovered evidence not reasonably discoverable at the time of the administrative claims.[5]

The nature and extent of Mrs. Bonner's illness was not known and was not reasonably discoverable when the administrative claims were made on March 25, 1969. When Dr. Atkinson started treating her in January 1969 he realized that she was nervous, but he considered that

---

5. The burden is on a plaintiff to show a basis for increasing the amount over the administrative claim. Smith v. United States, 239 F.Supp. 152 (D.Md.1965); Rudd v. United States, 233 F.Supp. 730 (M.D.Ala.1964).

her problems were ninety percent physical and ten percent emotional. He was optimistic that his treatment could effect a complete recovery. He treated her for six months before her continued deterioration and the worsening of her symptoms caused him to conclude that she had a severe neurosis and was permanently disabled.

The large damage claims in this case are based on Mrs. Bonner's illness being psychiatric and the prognosis that she will be permanently disabled. The evaluation of the case for damages on those bases could not have been made at the time of the administrative claims because the doctor treating her had not made the diagnosis. The newly discovered evidence in this case is expert opinion evidence which wholly changed the case for evaluation of damages purposes,[6] and neither plaintiffs nor their counsel could reasonably have known the medical extent of Hazel Bonner's disability at the time of the administrative claim.

The government contends that the symptoms of her permanent disability had manifested themselves before the filing of the administrative claim and the diagnosis and naming of her disability as a neurosis cannot be regarded as newly discovered evidence. I cannot agree. The expert opinion evidence diagnosing symptoms was more than a "naming" of the symptoms. It presented a wholly new basis for evaluation of the case for damages. The item of damage claimed for psychiatric treatment demonstrates this dramatically. There was no basis whatever for claiming a sum for psychiatric treatment until her symptoms were diagnosed as being those of a psychiatric illness.

■ Dr. Latour did not examine her until after the suit was filed. The outlook for her needs on account of her ill-

ness could not reasonably have been determined before that time and a realistic evaluation of the damages could not have been determined. The motion to amend the petition to increase the amount of damages prayed for will be allowed.

## DAMAGES [7]

*Hazel Bonner*

### 1. *Hazel Bonner's loss of earnings*

Hazel Bonner had always worked as a seamstress except when she was ill or was needed to care for her grandchildren. The evidence preponderates that she intended to return to her work when this vacation trip to New Jersey was over.

There is no dispute among the experts in this case that the reasonable probability is that Hazel Bonner will be totally and permanently disabled for the remainder of her life. The government agreed at the trial that she had a worklife expectancy to the age of sixty three years. The plaintiff's actuarial expert, W. E. Groves, a consulting actuary in New Orleans, testified as to mathematical calculations for discounting money at four and one-half percent on a daily and on a weekly basis for her worklife expectancy and for her life expectancy of 27 years, and for a cost of living adjustment at two percent. There is no issue as to the gross amount of Hazel Bonner's past and future loss of earnings. They are computed as follows:

| | | |
|---|---|---|
| 4/7/67 to 3/1/70 | 150 weeks at $52.00 | $ 7,800.00 |
| 3/1/70 to 4/22/71 | 59 weeks at $64.00 | 3,776.00 |
| Future loss | | 29,365.00 |
| Cost of living adjustment | | 3,050.00 |
| | Total | $43,991.00 |

■ The government contends that recovery should be allowed only for the net figure after consideration of federal and state income taxes that would be withheld

---

6. This case is analogous to United States v. Alexander, 238 F.2d 314 (5th Cir. 1956), wherein it was not known at the time of the filing of the administrative claim whether the plaintiff's broken arm and dislocated shoulder would mend without sur-

gery. See also Rabovsky v. United States, 265 F.Supp. 587 (D.Conn.1967).

7. The damage award is governed by the law of New Jersey where the accident occurred. No dispute exists on this point.

from the earnings. No authority is cited for this contention and no persuasive argument is advanced for such a deduction in a personal injury case. The gross earnings will be allowed.

2. *Future care for Hazel Bonner*

Dr. Latour and Dr. Sheinkin recommended that Mrs. Bonner have intensive psychiatric therapy for at least six months away from her family to overcome the secondary gains of the care she has received from her family. Dr. Latour testified that several hospitals for the therapy were available in the country and that the minimum cost for such treatment at DePaul is $2,300.00 per month. The government agrees that this is a reasonable estimate of the cost of such treatment. The cost for six months is $13,-800.00.

■ Mrs. Bonner will require assistance and help in her daily living for the remainder of her life. Her condition at the time of trial permitted her to be cared for at home. Mrs. Raie Sharfstein, an interviewer for job placement with the Louisiana Division of Employment Security, testified that a live-in home attendant's wages for a five-day week are $60.00. At this rate the cost for a seven-day week would be at least $84.00. The government agrees that $6.00 per day is a reasonable value for room and board of a live-in attendant. The government contends, however, that the Court should not award the usual rate for home attendant care, but should be guided by what Mr. Bonner testified that he paid a woman who lived with the family immediately after the accident—$15.00 per week, plus room and board. This woman was a friend of Mrs. Bonner's family so that the accommodation factor must be taken into consideration and Mrs. Bonner had not developed the completely disabling neurosis at that time. Basing an award on those circumstances would be unrealistic at this time. Accordingly Mrs. Bonner is entitled to receive as damages the cost of a live-in attendant at the rate of $136.00 per week. Hazel

Bonner contends that she is entitled to this sum discounted over 27 years which is $109,271.92 and to the cost of living adjustment, which the actuary testified to be 2 percent, which would add $27,075.76 to that figure, making a total for future care of $150,147.68.

She would not be entitled to the cost of the live-in attendant during the six months that she is in a hospital receiving psychiatric treatment. Adjusting the total for 27 years to make allowance for this period would reduce it to $147,367.17.

3. *Pain, Suffering, Humiliation, Embarrassment, Mental Anguish, etc.*

Hazel Bonner contends that she will be in serious pain for the remainder of her life, and that this pain is as real as if there were a physical basis for it. She claims additional damages for the difficult psychiatric treatment that she must endure in an effort to have her condition improve. She contends that she will have the stigma of being a mental patient or "nut" for the remainder of her life which will cause her humiliation, embarrassment and mental anguish. According to her, just compensation would be as follows:

| | |
|---|---|
| Past (48 months) | $ 48,000.00 |
| At least six months in DePaul | 25,000.00 |
| Remainder of life at $500.00 per month discounted | 94,018.00 |
| Cost of living adjustment | 23,304.00 |
| Total | $190,322.00 |

■ The requests for this item are excessive and not supported by the evidence. Mrs. Bonner had a severe whiplash and was in severe pain for the six months through her treatment by Dr. Frensilli. An award of $12,000.00 for pain and suffering through that period is justified. She was improved by Dr. Frensilli's treatment and, although she has continued to suffer pain in her neck, shoulders and back, she did not return to Dr. Frensilli for further treatment and she did not consult any other physician because of the pain. She was referred to Dr. Atkinson by the optometrist who

could find no reason for her vision complaints and her blinking and twitching of the eyes. In the light of this evidence $3,000.00 per year would adequately compensate her for pain, suffering and mental anguish since the Frensilli treatment and for future pain and suffering.

The intensive psychotherapy treatment will be difficult for her and there is a possibility that she may become psychotic during the treatment, but the evidence is not sufficient for a finding that it is reasonably probable that she will become psychotic. An additional $6,000.00 for the difficulty of this treatment will adequately compensate her. She will therefore be awarded the following for this item:

| | |
|---|---:|
| Past | $22,500.00 |
| Six months in DePaul | 6,000.00 |
| Future discounted | 46,352.00 |
| Cost of living adjustment | 11,470.00 |
| Total | $86,322.00 |

### 4. Disability

Counsel for Hazel Bonner points out that she is completely disabled, almost blind and cannot care for herself or have the usual enjoyment of life—cannot even read, write, watch T.V., sew or shop.

The damage for disability are itemized by Hazel Bonner as follows:

| | |
|---|---:|
| Past (48 months) | $ 24,000.00 |
| Remainder of life at $500.00 per month discounted | 94,018.00 |
| Cost of living adjustment | 23,304.00 |
| Total | $141,322.00 |

The evidence as a whole makes clear that this is her most serious item of damage. Her inability to see is the true cause of her disability. Before her vision became so bad that she had to give up driving the automobile the evidence does not show that she was disabled to perform the ordinary functions of everyday living. Her symptoms were more vexing and annoying than disabling—the irritation and redness of the eyes. The evidence preponderates that these symptoms worsened and she was totally disabled

when her daughter came to live with her in June 1969.

The item for past disability is based on total disability from the time of the accident. The evidence does not support such a finding. Her total disability did not occur until June or July 1969.

The government contends that a separate award should not be made for disability because it amounts to compensation for the same thing under a different name inasmuch as her disability is a result of her pain and suffering and the pain and suffering caused the disability. I cannot agree. Mrs. Bonner suffers disability apart from the pain and suffering and mental anguish. As pointed out she is unable to care for herself because of her vision difficulty and her eye problems which cause little pain but produce total disability.

The government urges that $60,-000 would be a generous award for both disability and pain, suffering and mental anguish. I am convinced that such an award would be most inadequate and will therefore make the following award:

| | |
|---|---:|
| Past | $ 11,000.00 |
| Remainder of life at $6,000 per year discounted | 92,431.00 |
| Cost of living adjustment | 22,911.00 |
| Total | $126,342.00 |

### James N. Bonner

#### 1. Loss of consortium

James N. Bonner contends that he should be awarded the following amounts to compensate him for the loss of his wife's services, society, companionship and comfort.

| | |
|---|---:|
| Past — 4 years at $20.00 per day | $ 29,200.00 |
| Future — $20.00 per day for remainder of Mr. Bonner's life (20.9 years) discounted | 96,240.00 |
| Cost of living adjustment | 18,960.00 |
| Total | $144,400.00 |

He points out that her disability prevents a normal marital relationship. They can have no social life, she can per-

**654**

form no services for him, cannot even take care of his clothes and her diminished sexual desire has in effect terminated their sexual relations.

The government suggests that $10,-000.00 would be a generous award in view of the fact that Mr. Bonner's employment kept him away from home much of the time. Mr. Bonner admitted when he testified that he was away from home much of the time. This must be taken into consideration in making this award. It is true that Mrs. Bonner cannot enjoy social life away from the home, but she is not psychotic and is not totally disabled from having companionship with her husband.

Mr. Bonner in his demand made no allowance for the fact that his employment as a truck driver would affect the value of the loss of consortium, or that Mrs. Bonner became totally disabled in June 1969. An award of $10.00 per day would result in a total award of approximately $75,000.00. I feel this is adequate under the circumstances of this case. The award for loss of consortium is as follows:

| | |
|---|---|
| Past | $ 6,610.00 |
| Future — $10.00 per day for the remainder of Mr. Bonner's life discounted | 48,120.00 |
| Cost of living adjustment | 9,480.00 |
| Total | $65,210.00 |

**2.** *Special Damages*

The following items of special damages are not disputed by the government:

| | |
|---|---|
| Airline Tickets | $ 150.17 |
| Hospital | 258.80 |
| Drugs | 659.15 |
| Dr. Joseph J. Frensilli | 120.00 |
| Dr. Leon L. McIntire | 424.00 |
| Dr. John W. Atkinson | 225.00 |
| Surgical appliance | 32.40 |
| Loss of wages—Mr. Bonner | 125.00 |
| Total | $1,994.52 |

Hazel Bonner will be awarded damages in the amount of $404,022.17, and James N. Bonner will be awarded $67,204.52.